## 53300. CHAMBERS v. THE STATE.

QUILLIAN, Presiding Judge.

Defendant was convicted of the offense of statutory rape of the daughter of the woman he was living with. The alleged victim was ten years old. She was living with her mother at that time but had been staying temporarily with her father. Her parents were divorced and her father had remarried. When her mother came to her father's house to take her home the victim began crying, told her mother she did not love her, did not want to go home with her, and that the man she was living with — the defendant, had "molested her." Defendant appeals the verdict of guilty and sentence of twenty years. *Held:*

Defendant contends that the verdict and judgment of the trial court are contrary to law. We agree. Code Ann. § 26-2018 of the Criminal Code (Ga. L. 1968, pp. 1249, 1302), states, in part, that a person commits statutory rape when he engages in sexual intercourse with any female under the age of 14 years who is not his spouse. It also provides that "no conviction shall be had for this offense on the unsupported testimony of the female."

Although the present statute is of recent origin (Ga. L. 1968, p. 1302), its antecedent — Code §§ 26-1303 and 26-1304, also included the qualification "that no conviction shall be had for said offense on the unsupported testimony of the female. . ." Accordingly, cases prior to 1968 can be used in determining sufficiency of corroboration of the victim.

Our Supreme Court held that " 'Slight circumstances may be sufficient to corroborate the woman. The sufficiency of the corroboration and the extent of the corroboration necessary is always a question for the jury.' " *Strickland v. State,* 207 Ga. 284, 286 (3) (61 SE2d 118). Accord, *Wynne v. State,* 139 Ga. App. 355, 356 (2) (228 SE2d 378). In another case where a pupil made an immediate report to her teacher of an incident occurring at school, the court held that "the asserted . . . complaint, being dependent for its proof solely upon the testimony of the female, did not constitute a corroboration of this witness." *Griffith v. State,* 176 Ga. 547 (3) (168 SE 235); but see *Wesley v. State,* 225 Ga. 22 (1) (165 SE2d 719). A

more comprehensive test was set forth in *Wright v. State,* 184 Ga. 62, 67 (4) (190 SE 663), where it was held: "the evidence supporting that of the female or corroborative thereof must be testimony other than that of her own, as to the commission of the offense by the accused; and while it need not be sufficient of itself to establish the guilt of the accused, it must tend to establish his guilt . . . although it is not necessary that the female be corroborated as to every essential element of the crime. In other words, there must be corroborating evidence fairly tending to prove that the crime was committed, and that it was committed by the defendant. Such corroborative evidence, whether consisting of acts or admissions, must at least be of such a character and quality as tends to prove the guilt of the accused by connecting him with the crime."

Although this latter case comports with the general rule that where corroboration is required by statute it must be ". . . by testimony, other than [the victim's], fairly tending to prove that the crime was committed and connecting the accused therewith. . ." (75 CJS 565, Rape, § 78 (b) (2); accord, 65 AmJur2d 821, Rape, § 96), our Supreme Court "has consistently held that only the fact of commission of the crime of rape must be corroborated by other evidence and that corroborating identification evidence is not necessary." *Clemmons v. State,* 233 Ga. 187, 188 (210 SE2d 657); *Lynch v. State,* 234 Ga. 446, 447 (216 SE2d 307). Thus, the question presented is whether this rule, which applies to "rape" should also apply to "statutory rape?"

The wording of both statutes (Code §§ 26-2001, 26-2018) as to corroboration is the same. The principal distinction between them being whether the female victim is under the age of 14, which renders her incapable of consent. *McFall v. State,* 235 Ga. 105, 106 (2) (218 SE2d 839). Consent being immaterial as to statutory rape, force is also immaterial as "her age is conclusive that the act is done forcibly and against her will." Id. p. 107. Accordingly, as the distinguishing features are immaterial as to the element of corroboration, we see no reason why *Clemmons* and *Lynch* should not apply to the offense of statutory rape. We hold that they do and find that "corroborating identification evidence is not

necessary" in statutory rape prosecutions.

If identity need not be corroborated we can apply the latest expression of the Supreme Court on corroboration of a "rape" victim (*Burnett v. State,* 236 Ga. 597, 598 (225 SE2d 28)), wherein they held "[t]he quantum of corroboration needed in a rape case is . . . that amount of independent evidence which tends to prove that the incident occurred as alleged. . . Slight circumstances may be sufficient corroboration, and ultimately the question of corroboration is one for the jury. *If there is any corroborating evidence, we will not go behind the jury and pass upon its probative value.*" (Emphasis supplied.) Accordingly, we need determine only whether there is *any* corroborating evidence — aliunde the testimony of the alleged victim.

The alleged victim, aged 10, admitted on cross examination that she had "accused" seven other male persons of sexually molesting her. She admitted that she accused her mother's younger brother but "[h]e didn't do it . . . I was just upset." The victim's mother added another name to that list and told of her daughter dreaming about people sexually molesting her. The victim admitted to these dreams when she testified. The mother also testified that her daughter admitted to her that the defendant and two other persons she had accused had not done anything to her. When the mother asked her daughter why she had said this about the defendant, her daughter said: "I was just upset . . . Daddy told me to make you all's life miserable and that's all I could think of." While testifying, the daughter said that her father had asked her to make life "miserable" for her mother and "she was upset" when her mother came to take her from her father's home and she did not "want to go live with her." She told her mother about the defendant on the way to her mother's house. She also testified that she had told her mother, her grandmother, and the defendant's lawyer that the defendant "did not do what [she] said that he did."

When the defendant was accused by the mother he insisted that the daughter be taken to a doctor to prove that he had not "bothered her." After being indicted he and his counsel requested the district attorney's office to enter into an agreement in which "both defendant and

[the female victim] were to be given polygraph tests under certain conditions . . . [and] each stipulated, that polygraph tests would be given both parties with the results to be used as evidence. . ." Because polygraph operators refused to give a 10-year-old child a lie detector test, a court order was secured and the state crime lab's examiner administered tests to the defendant and the alleged victim. The results were introduced into evidence after a motion to suppress was denied by the trial court. The polygraph examiner concluded the defendant was "withholding information" and the female victim was "truthful." When asked "in simple layman's language, is it your opinion that the defendant lied," the witness replied: "Yes, sir, it is."

The doctor who examined the young girl's genitalia for evidence of "possible rape" found "no evidence of acute trauma . . . and no evidence of acute injury." There was no hymen present, but "nothing else of significance [was] found." The "size of her vagina" was normal for a girl of her age. Penetration by a grown man's "male organ" was possible, but "not with full penetration." The concluding question to the doctor was ". . . your testimony is that you actually discovered no evidence of sexual intercourse. A. That's correct."

The mother testified that her daughter had an accident when she was eight years old: "a stob went into her vagina." Later she had a kidney infection and the doctor had to go through her vagina to stretch the bladder tube. Four persons whom the alleged victim accused of sexually molesting her testified that the accusations were not truthful.

In summary, there was no evidence of an outcry during the alleged incident, no fresh complaint following the alleged incident, no torn or ripped clothing, no bruises, abrasions or injuries to the alleged victim's body or genitalia or any other corroborating circumstances. The incident was revealed approximately one month after its alleged occurrence, when the daughter was "upset" with her mother, and after she had been told by her father to make life "miserable" for her mother and the defendant. Does this evidence satisfy the statutory requirement for corroboration? We say no.

If none of the above amounts to corroboration, do the results of the polygraph tests administered to the defendant and the alleged victim amount to corroboration required by the statute?

In *Salisbury v. State,* 221 Ga. 718 (146 SE2d 776) our Supreme Court took its first look at the problem of the polygraph. It concluded that "results of lie detector tests are inadmissible." 221 Ga. p. 719. This court then held that "even though the defendant consented to the test and agreed that its results be admitted in evidence . . ." results of the test were *not* sufficient "to corroborate the testimony of" a conspirator as "the results of a polygraph test are not only inadmissible but also have no probative value." *Famber v. State,* 134 Ga. App. 112, 113 (213 SE2d 525). *Famber* was followed in *Cross v. State,* 136 Ga. App. 400, 402 (3) (221 SE2d 615), where the court stated that even though a polygraph test was "admitted in evidence it would have had no probative value."

The Supreme Court has taken another look at the polygraph evidence issue in a case involving two defendants where only one of them took the lie detector test and consented to its admissibility. Two Justices concluded there was "reversible error as to both defendants in the admission of the polygraph testimony even without objection." *Scott v. State,* 238 Ga. 30 (230 SE2d 857). Two other Justices found reversible error as to the defendant who did not take the lie detector test because of the testimony concerning his co-defendant's failure of the test. There were three dissents. One dissenting Justice disagreed with *Famber* and was of the opinion that its "conclusions were erroneous." The result is that *Famber* lives — but in jeopardy, and the current status of admissibility of a polygraph test is left in doubt.

We will re-examine our criteria for admissibility of psychological and physiological tests. See generally 29 AmJur2d 923, Evidence, § 831; 22A CJS 518, Criminal Law, § 645 (1); 23 ALR2d 1306; 41 ALR3d 1369. The competency of experimental evidence depends on its trustworthiness to aid in the solution of the problem presented. If the test is to be admissible it must have been conducted by an expert in the particular branch of science

involved and the courts must recognize and accept the method of testing. Id. The results of the so-called "lie detector" tests have been generally excluded by the majority of courts because the theory on which they are based has not met with general scientific acceptance. *Stack v. State,* 234 Ga. 19, 21 (1c) (214 SE2d 514); Green, The Georgia Law of Evidence § 77; 22A CJS 525, Criminal Law, § 645 (2).

The history of the theory of "lie detection" can be traced to Erasistratus, a Greek physician, in 250 BC, who noted that a person's pulse could indicate psychological stress. Trovillo, A History of Lie Detection, 29 J. of Criminal Law 848 (1939). Admittedly, today's polygraph is an advanced mechanical device for measuring an individual's physiological response to psychological stress. But is it sufficiently accurate and trustworthy to be accepted as evidence of truth or falsity of the statement of a witness? Is this not invading the very province of the jury? Cf. *Jones v. State,* 232 Ga. 762, 764 (208 SE2d 850); see Annot. 23 ALR2d 1306. Would the jury abandon its role in ascertaining who is telling the truth and rely upon the test results? Does the public trust of accuracy of machines such as the electronic calculator and computer, lead us to a conclusion of accuracy of test results of the polygraph? The infallibility of the calculator and computer cannot compare with "opinion" as to "interpretation" of physiological responses of minor, medium or high intensity, to either a precise or imprecise question, which may or may not follow a control question or a "guilt complex" question, with or without a delayed response on one or two of the indicators. For example if a polygraph operator received a significant pulse response to a "guilt complex" question on whether or not the person being tested masturbated, followed by a minor galvanic response as to whether the person tested raped the victim — could the perspiration which caused the galvanic response be a delayed reaction to the earlier "guilt complex" question, or could it show guilty knowledge of only fondling the victim, or could it be withheld knowledge of an attempt to rape the victim which failed, or was it a lie as to the actual rape? Should the jury be required to know all responses to all questions — or

merely accept the conclusion of the operator — subject to cross examination of the opposing party?

Is the "state of the art" of lie detection so exact and precise that we will admit opinion evidence as to the interpretation of its graph, without stated controls as to content of questions to be asked of the witness by the examiner? Does a physiological response of different magnitude indicate guilty knowledge, withholding of evidence, or a pure lie? Is the opinion of a polygraph operator admissible when he examines both witnesses whose testimony is in conflict? If he is of the opinion that one is telling the truth, does that necessarily exclude any possibility of arriving at an opinion that the other party could be truthful? The examiner cannot be correct if he is of the opinion that both persons are truthful and they give conflicting answers to the same question. Can we permit the opinion of the polygraph examiner to go to the jury in its raw form, or must it be phrased in acceptable legislative or judicial terminology as in sanity examinations? See Code Ann. § 26-702, Criminal Code of Georgia (Ga. L. 1968, pp. 1249, 1270). Should a jury receive special instructions on the weight to be accorded such opinion evidence? See *Edge v. Edge,* 134 Ga. App. 162 (1) (213 SE2d 540). Should it be mandatory that a charge be given on expert opinion testimony? We can see that there are many questions but few answers.

Turning first to the issue of trustworthiness of the results of a polygraph examination and its interpretation, two universally accepted experts, Horvath and Reid, stated that "[i]n roughly 10 percent of the polygraph cases the records will be uninterpretable by even the most skilled examiner. In about 65 percent of the cases, however, the responses or lack of responses, to the control questions and relevant questions are sufficiently subtle in appearance and significance so that only a highly skilled and well trained examiner will be able to interpret them for truth and deception." Horvath and Reid, The Reliability of Polygraph Examiner Diagnosis of Truth and Deception, 62 J. of Cr. L. 276, 278 (1971). Fred E. Inbau, Professor at Law, Northwestern University, and author of several books and articles on the polygraph, testified in hearings before Congress that 80 percent of polygraph

operators are not qualified to interpret the results of the tests. That congressional committee which exhaustively investigated the polygraph and its accuracy concluded: "There is no 'lie detector,' neither machine nor human. People have been deceived by a myth that a metal box in the hands of an investigator can detect truth or falsehood." H. R. Rep. No. 198, 89th Cong., 1st Sess. (1965), Use of Polygraphs As "Lie Detectors" By The Federal Government. Their tenth report to Congress stated that "[t]he machine records physical responses which may or may not be connected with an emotional reaction — and that reaction may or may not be related to guilt or innocence." Id. p. 13.

Professor Inbau, in his book: "Lie Detection and Criminal Investigation," listed factors which posed difficulty in the diagnosis of deception by the lie detector: (1) Emotional tension — nervousness, experience by a subject who is innocent, but is affected by (a) fear induced by the mere fact that suspicion or accusation has been directed against him, particularly when the subject has been intensively or extensively interrogated, and (b) a guilt complex involving another offense of which he is guilty; (2) physiological abnormalities such as (a) excessively high or low blood pressure, (b) disease of the heart, (c) respiratory disorders; (3) mental abnormalities such as (a) feeblemindedness, (b) psychoses as in manic depressives, paranoids, schizophrenics, paretics, etc., (c) psychoneuroses and psychopathia, "as among so-called 'peculiar' or 'emotionally unstable' persons. . ."; (4) unresponsiveness in a lying or guilty suspect because of (a) lack of fear of detection, (b) apparent ability to unconsciously control responses by means of certain mental sets or attitudes, (c) a condition of "sub-shock" or "adrenal exhaustion" at the time of the test, (d) rationalization of the crime in advance of the test to the extent that lying arouses little or no emotional response, (e) extensive interrogation prior to the test (see 1a above); (5) *unobserved* muscular movements which produce ambiguous or misleading indications.

Understandably, we can see why the polygraph manufacturers and operators acclaim the accuracy of their product and their profession. But are they

sufficiently impartial and detached from their bias to provide the public with a complete and candid assessment? A team of professional psychologists engaged in extensive research on the polygraph industry claims of accuracy of tests and concluded "adequately controlled studies of the effectiveness of the lie detector that have been made by physiological psychologists indicate that the degree of success is close to 70 per cent..." Burkey, The Case Against the Polygraph, 51 ABA J. 855, 856; see also, Harmon, The Role of the Polygraph In Our Judicial System, 20 S.C. L. Rev. 804 (1968).

If as Reid says, 10% of the tests are not decipherable, and 65% require "highly skilled and well trained" examiners, and as Inbau concluded 80% of the examiners are unqualified, and further as the psychologists determined from controlled testing, that examiners are only 70% accurate — is that the quality of evidence we should permit to influence such close and crucial questions? Does the stark assertion of the polygraph examiner that this person is lying and that person is telling the truth usurp the ultimate function of the jury? Is the juror likely to give undue weight to the polygraph test result — the same as we now say is given to a judge's comment on the evidence — which we prohibit? Code § 81-1104. Most certainly, if polygraph test results are to be permitted, a concomitant must be limiting instructions both at the time of admission and in the final charge to the jury. See Code § 38-420. In addition, examiners should be required to qualify their opinion as to the type of response indicated, and to what questions. Cross examination should be permitted on whether the response indicated that the witness was "withholding information," "not completely truthful," "clearly lying," "had guilty knowledge," or responded to only three out of five guilt questions, with minimal or medium, or significant response, in one or two or more of the polygraph indicators.

The most significant recent development in this field is recognition by courts of admissibility of polygraph results pursuant to a stipulation of all parties. "Polygraph — Stipulation of Admissibility," Annot., 53 ALR3d 1005. State v. Valdez, 91 Ariz. 274 (371 P2d 894), is considered

the leading case on this issue. The Valdez case recognizes the inherent deficiencies of the polygraph but concludes that it may have some probative value and attempts to balance the known limited reliability of the polygraph with sufficient safeguards to permit both the state and the defendant to assume the risk involved and stipulate into evidence the results of the test. The court has drawn legal parameters which would permit introduction of such evidence when: (1) the prosecutor, defendant and his counsel stipulate for defendant's submission to the test and admission of the graph and examiner's opinion in evidence, (2) the party not submitting the graph in evidence has a right to fully cross examine the testifying examiner, (3) the trial judge retains discretion to refuse admission, based upon the examiner's qualifications, and compliance with stipulated test conditions (see Code § 38-1601), and (4) the judge will instruct the jury that the examiner's testimony does not tend to prove or disprove any element of the crime charged, but *"at most" indicates only that the defendant was or was not telling the complete truth,* and the jury is to determine the weight that such testimony is to be given.

The problem presented by polygraph tests is more legislative than judicial. But until the legislature speaks, it is a judicial problem. Valdez is pure judicial legislation, complete with rules and regulations. This court should not attempt to revise Title 38 of the Code of Georgia on Evidence to legislate a section on polygraph test results. Until we have proper legislative action which provides for necessary safeguards and restricts polygraph test results to their proper niche in the evidentiary role of the trial process, we should follow the course of the majority of the courts and *Famber v. State,* 134 Ga. App. 112, supra, and hold polygraph tests are "not only inadmissible but also have no probative value."

There being no corroborative evidence to the testimony of the alleged victim tending to prove the incident occurred, the verdict was not authorized and must be reversed. *Burnett v. State,* 236 Ga. 597, supra; *Famber v. State,* 134 Ga. App. 112, supra.

*Judgment reversed. Stolz and Shulman, JJ., concur.*

SUBMITTED JANUARY 12, 1977 — DECIDED FEBRUARY 14, 1977 — REHEARING DENIED FEBRUARY 28, 1977 —

*Ben Lancaster,* for appellant.
*Charles Crawford, District Attorney,* for appellee.