THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* STEPHEN MONIGAN, Defendant-Appellant.

Fifth District    No. 78-6

Opinion filed May 21, 1979.

Michael J. Rosborough and John H. Reid, both of State Appellate Defender's Office, of Mt. Vernon, and Frank Hoffman, research assistant, for appellant.

Clyde L. Kuehn, State's Attorney, of Belleville (Raymond F. Buckley, Jr., and William S. Zale, both of State's Attorneys Appellate Service Commission, of counsel), for the People.

Mr. PRESIDING JUSTICE GEORGE J. MORAN delivered the opinion of the court:

Defendant appeals from a judgment of the circuit court of St. Clair County entered upon a jury verdict finding him guilty of the crime of murder.

■■ The principal question in this case is whether the trial court committed reversible error in admitting into evidence the results of a polygraph test over the objection of the defendant, when prior to trial the defendant, his attorney, and the State's attorney entered into a stipulation that the defendant would take the test and that the test results would be admissible in evidence. We hold that the results of the test were inadmissible in spite of the stipulation.

■■ Some of the reasons we so hold are:

(1) A polygraph test is not independent proof of any fact, but merely bears on the credibility of the defendant.

(2) The admission of the polygraph test has such an impact on the jury that the truth-seeking function of the trial will be destroyed.

(3) Unreliable evidence should not play a major part in the conviction or acquittal of a person charged with a crime.

(4) A stipulation cannot make unreliable evidence reliable.

(5) A stipulation that makes unreliable evidence admissible is contrary to public policy.

(6) A stipulation that unreliable evidence is reliable is really a stipulation of law and therefore invalid.

(7) It would be inconsistent for a court to refuse to admit polygraph tests into evidence because they are unreliable and then admit them into evidence by stipulation.

The testimony at trial indicated that Eula Ike and the deceased arrived at Blackman's Pepperroom Lounge in East St. Louis at approximately 8:30 p.m. on October 6, 1976. An argument between the victim and defendant occurred between 9:15 p.m. and 9:30 p.m., while the victim and Ms. Ike were dancing. Upon returning to their seats, defendant was in the victim's seat. When asked to leave his seat, defendant stated to the deceased, "I remember you." Defendant then began walking away. According to Ms. Ike's testimony, however, defendant rushed back at the victim and pushed him against the wall. Deceased Allen picked up a glass and hit defendant in the face with it, drawing blood. Whereupon defendant pulled a pistol from his waistband and shot the victim. Ms. Ike had an unobstructed view of the shooting, being approximately five feet from the defendant at the time. She stated that she was certain it was the defendant who shot the deceased, and that she did not notice a gun on the victim's person while she was dancing with him. On October 7, 1976, Ms. Ike made a definite photographic identification of the defendant at the East St. Louis Police Department. She selected defendant from a mugbook.

Larry Drisdel, an employee of the lounge, testified that he picked up the victim and Ms. Ike and they arrived at the lounge between 8 p.m. and 8:30 p.m. on October 6, 1976. Drisdel identified the defendant as the person who killed the victim. He stated that an argument between the defendant and the victim began when the defendant put his cigarette out on Ms. Ike's purse. When Drisdel tried to break up the argument, defendant stuck a pistol in his side. Defendant put the gun back in his waistband and proceeded toward the door as if to leave, but then rushed toward deceased. A fight began and people gathered around. Drisdel said he tried to break up the fight, but Jerome Lockett was in his way. Then a shot was fired. Drisdel testified that he did not see who fired it, but was certain it was not Lockett. Drisdel went to the hospital with Ms. Ike and the deceased. The following day he made a photograph identification of the defendant as the man who stuck the gun in his side.

On September 12, 1977, preceding the trial, the defendant, his attorney and the State's attorney entered into a written stipulation whereby defendant agreed to submit to a polygraph examination. The parties also agreed that the result of the examination could be offered into evidence by either party, that in such case the opposing counsel could cross-examine the polygraph examiner, Michael Musto, that the trial judge would be requested to issue a limiting instruction on the value of polygraph results, that the defendant knew he was not required to

undergo such an examination and that the results would otherwise be inadmissible. On September 13, 1977, the trial judge ordered the defendant to undergo the polygraph examination.

Musto testified that he was employed by the Illinois Department of Law Enforcement, Bureau of Scientific Services, and was one of approximately 150 licensed polygraph examiners in Illinois. He testified to the nature of such an examination and said he had conducted 1000 or more polygraph tests.

Musto said that the defendant consulted his attorney by phone prior to taking the test. Musto believed that the detectives who brought the defendant to the test had informed him of his constitutional rights. Musto did not see the defendant sign the necessary forms used by the State of Illinois, but the detective gave him the forms bearing the defendant's signature.

Musto testified regarding the pretest interview. Background questions regarding the defendant's health were asked and defendant responded that he had undergone open-heart surgery at some prior time. Musto said he did not determine what kind of heart condition defendant had. However, defendant stated that he was not in any pain therefrom or on any medication at the time of the examination. Musto also explained the questions that would be asked defendant during the examination prior to defendant's being connected to the polygraph machine. The operability of the machine was tested prior to the examination and Musto testified that the machine was in working order.

Some preliminary control questions were asked initially for comparative response purposes. Then the examiner asked what he termed "relevant" questions and the defendant answered. Musto testified as follows to the truthfulness of the answers the defendant gave:

> "Based upon this subject's polygraph testing on the following questions, 'On October 6, 1976, did you fire a gun at Kevin Allen in the Pepperroom Lounge?' When this subject answered, 'No,' the polygraph record indicated that he was very definitely not telling the truth on that. On the question, 'On October 6, 1976, did you shoot Kevin Allen?' This subject answered, 'No.' The polygraph records show that this subject was not being truthful on that question. On the questions, 'On October 6, 1976, did you have a gun in your possession in the Pepperroom Lounge,' the subject answered 'No.' The polygraph records indicated that this subject was not being truthful to that question. And, 'Did Kevin Allen hit you before any fighting ensued in the Pepperroom Lounge,' the subject answered, 'Yes.' The polygraph examination of this subject indicated that he was not being truthful on that question."

Musto further testified that polygraph results were from 85% to 95%

accurate, while admitting that the scientific community does not accept a polygraph as an infallible test. While admitting that certain heart conditions could affect the accuracy of polygraph results, Musto said he saw no such evidence in this case. The defendant's blood pressure and pulse responded normally and there was no erratic heartbeat. In fact, Musto said that in this case, the test was 100% accurate.

Subsequent to the examination, Musto confronted the defendant with the results of the examination. Musto testified that defendant's response was that he did, in fact, have a gun in the lounge, which gun was given to him by Jerome Lockett. Upon questioning defendant about the three other relevant questions, defendant stated that he did not want to discuss the matter further.

Prior to trial, defendant's attorney moved to suppress the preceding statements on the ground that defendant stipulated to the polygraph examination only, and nothing subsequent thereto, and that the defendant's sixth amendment right to counsel had been violated. The trial court denied the motion.

During the trial, the State referred to the result of the polygraph in its opening statement and via the testimony of Musto. Defense counsel objected to the admission of the results of the polygraph and vigorously preserved the record. The court overruled the objection with the conditions that Musto appear in court and be subject to cross-examination, and that a limiting instruction as to the value of polygraph results be given.

Appellant contends that the jury should have been instructed on the crime of voluntary manslaughter, that the trial court erred in admitting the results of the stipulated polygraph examination, that the incriminating statement made after the examination was elicited in violation of his sixth amendment right to counsel, and that he was denied a fair trial in violation of his fifth amendment privilege against self incrimination by the State's introduction of the testimony of Musto that the defendant refused to answer certain questions subsequent to the polygraph examination. We address only the question of whether the trial court correctly admitted the polygraph results into evidence, since we believe that issue is dispositive of this appeal.

We are faced with a situation where the defendant was apprised of the fact that he need not submit to such examination, but voluntarily chose to do so with the advice of counsel, and entered into a written agreement to that effect, stipulating that the results of the test would be admissible in evidence. The stipulation provided for the safeguards of the cross-examination of the polygraph examiner and a request of the court to issue a limiting instruction on the value of such test results.

The results of a polygraph test are generally inadmissible in evidence

to show the guilt or innocence of the accused. At least 41 jurisdictions follow this majority rule, including the District of Columbia. (Annot., 23 A.L.R.2d 1306 (1952); *People v. Nicholls*, 42 Ill. 2d 91, 245 N.E.2d 771 (1969).) The rationale seems to be that while the polygraph examination may be a valid investigative tool (*Leeks v. State*, 95 Okla. Crim. 326, 245 P.2d 764 (1952)), the results have been inadmissible in trial because, "[t]he scientific reliability of the polygraph has long been the subject of dispute among learned experts." *People v. Zazzetta*, 27 Ill. 2d 302, 309, 189 N.E.2d 260, 264 (1963); *Akonom v. State*, 40 Med. App. 676, 394 A.2d 1213 (1978); *State v. LaForest*, 106 N.H. 159, 207 A.2d 429, 430 (1965).

The State, however, argues that the defendant should be held to the stipulation which he knowingly entered into and that the presence of the written stipulation is dispositive of the question of admissibility. We recognize that the existence of a written stipulation has given rise to a split in authority as to whether the results of a polygraph examination so stipulated to are admissible in evidence.

Some courts have followed the opinion of the Arizona Supreme Court in *State v. Valdez*, 91 Ariz. 274, 371 P.2d 894 (1962), which permitted the admission of the polygraph test by written stipulation of the parties under the following conditions:

"(1) That the county attorney, defendant and his counsel all sign a written stipulation providing for defendant's submission to the test and for the subsequent admission at trial of the graphs and the examiner's opinion thereon on behalf of either defendant or the state.

(2) That notwithstanding the stipulation the admissibility of the test results is subject to the discretion of the trial judge, i.e. if the trial judge is not convinced that the examiner is qualified or that the test was conducted under proper conditions he may refuse to accept such evidence.

(3) That if the graphs and examiner's opinion are offered in evidence the opposing party shall have the right to cross-examine the examiner respecting:

a. the examiner's qualifications and training;

b. the conditions under which the test was administered;

c. the limitations of and possibilities for error in the technique of polygraphic interrogation; and

d. at the discretion of the trial judge, any other matter deemed pertinent to the inquiry.

(4) That if such evidence is admitted the trial judge should instruct the jury that the examiner's testimony does not tend to prove or disprove any element of the crime with which a defendant is charged but at most tends only to indicate that at the

time of the examination defendant was not telling the truth. Further, the jury members should be instructed that it is for them to determine what corroborative weight and effect such testimony should be given." 91 Ariz. 274, 283-84, 371 P.2d 894, 900-01.

However, in the very recent case of *State v. Frazier*, ___ W.Va. ___, 251 S.E.2d 39 (1979), the West Virginia Court of Appeals rejected the holding in *Valdez* in a scholarly opinion. Following are some excerpts from the *Frazier* opinion:

"There are several problems arising from the *Valdez* concept. Its central thesis of admissibility is the written stipulation. Yet, it is clear that by written stipulation parties cannot make evidence admissible that otherwise would be inadmissible. In other words, a written stipulation agreeing to the introduction of certain evidence is not the legal basis for its admissibility. *Pulakis v. State*, 476 P.2d 474, 479 (Alaska 1970) (polygraph test stipulation); 29 Am. Jur. 2d *Evidence* §13.

It is true that *Valdez* and its progeny suggest that the examiner's testimony concerning the polygraph test bears upon the truthfulness of the subject's testimony, and therefor his credibility. Yet, if this were the real basis for its admissibility, there would be no need for the written stipulation, since it is generally held that any witness' credibility may be impeached. [Citations.]

However, if the test bore merely on the issue of credibility, it would ordinarily not be admissible unless the defendant took the witness stand. Most cases that follow the *Valdez* stipulation, and *Valdez* itself, do not discuss, much less differentiate between, whether the test can be introduced in the state's case-in-chief or only for the impeachment of the defendant.

*   *   *

It is difficult to perceive how the written stipulation or the fact that the polygraph test can be admitted to impeach the credibility of the defendant can furnish any sound legal theory for the use of the polygraph in the state's case-in-chief. An even more difficult problem is encountered if we attempt to utilize these theories when the defendant seeks to admit a favorable polygraph test taken under a *Valdez* stipulation. If we follow the *Valdez* rationale that the polygraph test is not independent proof of any fact but merely bears on credibility, the defendant ordinarily cannot introduce his own extrajudicial exculpatory statements. They are generally thought to be too self-serving. [Citations.] We have not encountered a case which discusses this point. Obviously the defendant gains little from a *Valdez* stipulation if he cannot introduce a favorable polygraph test.

* * *

While the proponents of the admissibility of the polygraph test assume its substantial accuracy, there is still confusion as to the exact function it plays. Some, analogizing it to other scientific tests, such as ballistic tests, blood samples and other chemical tests, urge its admissibility as a scientific test, but state it is not proof of any independent fact.

There can be little question that from a jury standpoint, the polygraph test as interpreted by the expert is independent proof of what often are the most critical facts in the case, that is, the guilt of the defendant. It must be kept in mind that the general inter-rogation approach on a polygraph examination is to ask the defendant a series of questions to which only 'yes' or 'no' responses are given." ___ W. Va. ___, ___, 251 S.E.2d 39, 45-47.

The court went on to say that obviously, when the jury hears testimony from the polygraph expert that the polygraph test showed the defendant lied when he responded no to a question, the jury's conclusion will be that his true answer is yes.

"This result inexorably follows from the basic theory of the polygraph that it measures the physiological responses of the subject which cannot be masked when it lies. It is this spontaneous physiological response as interpreted by the expert which forms an independent fact of a scientific nature.

* * *

We are persuaded that despite the assertions of the scientific nature of the test, much depends on the subjective analysis of the test results by its operator. We know of no scientific test conventionally admitted by the courts which carries such a high degree of interpretative subjectivity.

* * *

In the final analysis, we do not accept the current legal theories under which courts have permitted the limited introduction of polygraph tests. There is the silent premise that these courts do not really believe the polygraph to be a scientifically accurate test such that it can be admitted as can other scientific tests. Consequently, admissibility is restricted on rather artificial grounds." ___ W. Va. ___, ___, 251 S.E.2d 39, 48.

We also agree with the sound reasoning in *Akonom v. State*, 40 Md. App. 676, 394 A.2d 1213, 1216 (1978), where that court said:

"We find these cases unpersuasive and would venture to suggest that they are guilty of putting the cart before the well-known horse. As we see it, the crucial issue is whether, as a matter of law, this type of evidence is sufficiently reliable or trustworthy. It cannot

logically be argued that a stipulation enhances in any significant way the inherent reliability of evidence produced by a so-called scientific process or art. *See, e.g. Pulakis v. State,* 476 P.2d 474, 479 (Alaska 1970). Even proponents of the use of polygraph evidence admit that a stipulation does not increase reliability. One strong supporter suggests that 'When a court admits polygraph evidence upon stipulation, it is probably because of a tacit belief in the accuracy of the technique.' Tarlow, *Admissibility of Polygraph Evidence in 1975: An Aid in Determining Credibility in a Perjury-Plaqued System,* 26 Hastings L.J. 917, 956 (1975). Thus, while we are generally reluctant to invalidate agreements entered into by the parties, we view this as one of the unusual occasions when we are obligated to do so. *See generally* Annot., Relief From Stipulations, 161 A.L.R. 1161; *Peddicord v. Franklin,* 270 Md. 164, 175 (1973)." 394 A.2d 1213, 1216.

We agree with other cases which hold that polygraph results are inadmissible in evidence, notwithstanding a written stipulation of admissibility. *Pulakis v. State; Chambers v. State,* 141 Ga. App. 438, 233 S.E.2d 818 (1977); *Conley v. Commonwealth,* 382 S.W.2d 865 (Ky. App. 1964); *State v. Corbin,* 285 So.2d 234 (La. 1973); *People v. Liddell,* 63 Mich. App. 491, 234 N.W.2d 669 (1975); *Fulton v. State,* 541 P.2d 871 (Okla. Crim. 1975); *Lewis v. State,* 500 S.W.2d 167 (Tex. Crim. 1973); *Le Fevre v. State,* 242 Wis. 416, 8 N.W.2d 288 (1943); Annot., 53 A.L.R.3d 1005 (1973).

■ We generally agree that a party may, by stipulation, waive the necessity of proof of any part or all of the case against him, and having done so, cannot complain later of evidence which he has stipulated into the record. (*People v. Hawkins,* 27 Ill. 2d 339, 189 N.E.2d 252 (1963); *People v. Hare,* 25 Ill. 2d 321, 185 N.E.2d 178 (1962); *People v. Smith,* 20 Ill. App. 3d 793, 314 N.E.2d 510 (1974).) However, we share the concern of the United States Supreme Court that "the proper administration of the criminal law cannot be left merely to the stipulation of parties." *Young v. United States,* 315 U.S. 257, 259, 86 L. Ed. 832, 835, 62 S. Ct. 510, ___ (1942).

We refuse to sustain such an evidentiary stipulation because it has not been demonstrated that the technique and processes used in a poloygraph examination are scientifically reliable. The landmark case of *Frye v. United States,* 293 F. 1013 (D.C. Cir. 1923) was the first case to address the standards of admissibility for scientific evidence. In discussing the unreliability of the results from a systolic blood pressure deception test, a forerunner of today's polygraph examination, the court said:

"Just when a scientific principle or discovery crosses the line between the experimental and demonstrable stages is difficult to

define. Somewhere in this twilight zone the evidential force of the principle must be recognized, and while courts will go a long way in admitting expert testimony deduced from a well-recognized scientific principle or discovery, the thing from which the deduction is made must be sufficiently established to have gained general acceptance in the particular field in which it belongs." 293 F. 1013, 1014.

In this case, Musto was the only expert witness to testify concerning polygraph tests and their acceptance in the scientific community. While we do not believe that he can testify as a conclusive representative of the scientific community, but only as one certified by the State to administer polygraph tests, we notice that he declared that polygraph examinations were not accepted by the scientific community as infallible, yet claimed 85% to 95% general accuracy and 100% accuracy in this case. Appellant, on the other hand, points out that there is a wide spread among experts even as to the degree of accuracy of the polygraph examination (see *e.g.*, Radek, *The Admissibility of Polygraph Results in Criminal Trials: A Case for the Status Quo*, 3 Loy. Chi. L. J. 289, 296 (1972) (which notes studies indicating accuracy in the lower 70% range); Horvath & Reid, *The Reliability of Polygraph Examiner Diagnosis of Truth and Deception*, 62 J. Cr. L. 276, 278 (1971)), and Musto's estimate seems to be on the higher side of the accuracy scale. And of concern to us is the apparent failure on the trial court's part to rule on the threshold question of the reliability of this evidence, presumably because of the written stipulation.

Furthermore, the estimate of the degree of accuracy of polygraph tests seem to come from polygraph examiners themselves. Speaking to the issue of scientific verification of such results, the Michigan Supreme Court recently stated:

"The fact is, that the results of most polygraph examinations are not verified by extrinsic evidence, and there are no scientific studies performed by other than polygraphers which purport to demonstrate scientific means of verification. This factor alone has been responsible for much of the anti-polygraph sentiment outside the polygraph profession." (*People v. Barbara*, 400 Mich. 352, 395, 255 N.W.2d 171, 189 (1970).)

See also Orne, Thackray & Paskewitz, *On the Detection of Deception*, Handbook on Psychophysiology 750 (Greenfield & Sternbach eds. 1972).

This may be why many still consider polygraphic examinations "pseudo-scientific." *State v. Boodry*, 96 Ariz. 259, 394 P.2d 196 (1964), *cert. denied*, 379 U.S. 949, 13 L. Ed. 2d 546, 85 S. Ct. 448 (1964).

Another matter of our concern is the absence of a strictly physical basis for polygraph results. In *United States v. Wilson*, 361 F. Supp. 510, 512 (D. Md. 1973), the court spoke directly to this issue:

"A study of the theory and process of the polygraph examination reveals complexities not present in the fields of fingerprints, handwriting, voiceprint, ballistics and neutron activation analysis, all of which are based on the identity or behavior of physical phenomena. The experts and studies differ as to the capability of the polygraph industry to cope with these complexities, but none would dispute their existence. The distinction is that polygraphy, albeit based on a scientific theory, remains an art with unusual responsibility placed on the examiner. The acquainting of the examiner with the subject matter is often a source of improper suggestion, conscious or subconscious. The preparation of the test and the discussion with the examinee of the polygraph procedure furnishes additional opportunity for improper subjective evaluation."

The Illinois Supreme Court has acknowledged that "the expertise of the operator and interpreter has substantial bearing on the reliability of the polygraph." (*People v. Zazzetta*, 27 Ill. 2d 302, 309 (1963).) We do not suggest any impropriety on the part of Mr. Musto or the State. On the contrary, we acknowledge that the State went to great lengths to abide by those cases which allow polygraph test results to be admitted in evidence pursuant to a stipulation. We are here concerned with the effect of our licensing such a procedure, and the problems inherent therein.

There are many problems connected with polygraph tests. In line with our concern about the examiner's role in testing, we note that Fred Inbau, a recognized expert in this field, states that 80% of all polygraph examiners are unqualified. (Burkey, *The Case Against the Polygraph*, 51 A.B.A.J. 855, 856 (1965).) While the examiner may be subject to cross-examination, the polygraph itself is not susceptible to in-court examination and testing. (*State v. Lowry*, 163 Kan. 622, 185 P.2d 147 (1947).) We are also concerned that too many jurors may inordinately weigh polygraph results as conclusive (*State v. Cole*, 354 Mo. 181, 188 S.W.2d 43, 189 S.W.2d 541 (1945); *Romero v. State*, 493 S.W.2d 206, 213 (Tex. Crim. 1973); Kaplan, *Lie Detector: An Analysis of Its Place in the Law of Evidence*, 10 Wayne L. Rev. 381, 386 (1964)). And we also fear that in too many cases, a limiting instruction will not have the desired impact on the jury. (*Shepard v. United States*, 290 U.S. 96, 103, 78 L. Ed. 196, 54 S. Ct. 22 (1933); *People v. Deal*, 357 Ill. 634, 192 N.E. 649, 652 (1934); *National Cash Register Co. v. Kay*, 119 S.W.2d 437 (Mo. App. 1938).) The use of such results also seems to displace the jury as finder of fact and adjudicator of guilt or innocence. (*United States v. Alexander*, 526 F.2d 161 (8th Cir. 1975).) In the recent case of *Akonom v. State*, 40 Md. App. 676, 394 A.2d 1213 (1978), the court said:

"We are also troubled by other likely effects of institutionalizing

polygraph testing. Were private practices to spring up, some defendants might 'shop around' until they passed an examination without divulging prior unsuccessful tests. On the other hand, the indigent defendant would be unable to 'take an examination without the government's financing and knowledge.' Wilson, supra, 514."

(*State v. Bohner*, 210 Wis. 651, 246 N.W. 314, 86 A.L.R. 611 (1933); Note, *Problems Remaining for the "Generally Accepted" Polygraph*, 53 B.U.L. Rev. 375, 377 (1973).) The Illinois Supreme Court has taken notice of most of these concerns already (*People v. Zazzetta*), as has the United States Justice Department in taking a strong stand against the use of polygraph results at trial. (See Abbell, *Polygraph Evidence: The Case Against Admissibility in Federal Criminal Trials*, 15 Am. Crim. L. Rev. 29 (1977).) We noted our concern with Musto's testimony regarding the high degree of accuracy of the polygraph. His testimony conflicts with other estimates of its reliability, and fails to satisfy us that this instrument is scientifically trustworthy and accepted by the scientific community. We are also troubled by the almost total subjectiveness surrounding the use of the polygraph and the interpretation of the results: the results arise from psychological factors and their interpretation is totally dependent on the examiner's analysis. See generally Inbau, Lie Detection and Criminal Investigation.

Also of much concern here is the effect of defendant's open heart surgery in January 1979 on the polygraph results. It is acknowledged that the subject's physical condition, including heart abnormalities, can affect the outcome of the test. (J. Reid & F. Inbau, Truth & Deception 184 (1966); Wilner, "Polygraphy: Short Cut to Truth?", 29 U. Fla. L. Rev. 286, 296 (1977).) Here, the defendant informed Musto of his previous heart surgery, but the matter was not investigated further. Musto agreed that a heart condition would affect the test results, but stated: "I can see clearly that that did not stop the changes in blood pressure and pulse needed for my polygraph." This is just another example of the subjective interpretation of the manifestations by the polygraph examiner. We wonder if Musto's conclusion would have been the same had the matter of defendant's heart condition been investigated further *prior* to the examination. In other words, our concern centers around whether Musto's analysis of defendant's physical condition was a result of impartial pre-examination testing, or a consequence of suggestion from the results of the test. This type of subjective factoring supports our belief that there are so many inequities inherent in the use of the polygraph as to make it, at this point in time, grossly unreliable, if not absent any probative value. Accord, *Chambers v. State*, 141 Ga. App. 438, ___, 233 S.E.2d 818, 824 (1977).

We have viewed the use of the polygraph tests from the general to the specific citing authority from numerous jurisdictions other than our own. We believe that the Illinois courts have not addressed all of our concerns, and we have looked to outside case law and secondary authority for assistance. Yet, the State maintains Illinois case law is supportive of the admissibility of polygraph results pursuant to a stipulation. The State argues that *People v. Zazzetta* stands for the proposition that polygraph results are admissible into evidence so long as evidence as to the method of testing and qualifications of the examiner is presented. The case dealt with an indigent educated through the eighth grade, who was representing himself. He orally stipulated that he would take a polygraph test and allow the results admitted in evidence. While noting that the reliability of polygraph results was a matter of scientific dispute, the court said, "[W]e are not compelled to take sides in that argument which has not been presented to us." (27 Ill. 2d 302, 309). We therefore hold that *Zazzetta* does not say that by stipulation a party could agree that the results of a polygraph test would be admitted into evidence.

The State further argues that Illinois courts have cited *Zazzetta* as authority for the admissibility of polygraph results pursuant to stipulation. *People v. Oswalt*, 26 Ill. App. 3d 224, 324 N.E.2d 666 (1975), is an opinion from this district, without case or statutory citation, which held that the results of a polygraph examination were properly excluded, particularly since no offer of proof was made as to what those results were.

The State also cites *People v. Parisie*, 5 Ill. App. 3d 1009, 287 N.E.2d 310 (1972), which adopted the *Zazzetta* language. As we stated before, the *Zazzetta* language is limited, and the reference to the "admission by stipulation" practice was made with regard to jurisdictions other than Illinois. And *Parisie* is further limited to the holding that testimony regarding the taking of a polygraph examination by a *witness* was harmless error as to the defendant.

*People v. Saffold*, 47 Ill. App. 3d 934, 365 N.E.2d 524 (1977), is also offered by the State in support of its theory of admissibility. There the court cited the general exclusionary rule and the *Zazzetta* stipulation language, noting as we have:

> "[T]he polygraph or lie detector is not an instrument which automatically and unerringly discloses a lie being told by the person being tested. It cannot be said to be completely accurate because of the human elements * * *." (47 Ill. App. 3d 934, 937-38.)

The First District held, therefore, that defendant could not introduce the results of a polygraph examination administered by a private testing agency. We find nothing in that opinion contrary to our holding here.

We finally address our opinion in *People v. Potts*, 74 Ill. App. 2d 301,

220 N.E.2d 251 (1966). *Potts* was a rape case where the parties stipulated that the results of a lie detector test would be admitted in evidence. The examiner prepared a written report which was admitted into evidence, without the examiner testifying at trial. The court held that admission of the report was highly prejudicial to defendant, and that such admission without inquiry into the qualifications of the operator and the manner in which the test was given required reversal of the conviction. The court did not hold, as the State argues, that polygraph evidence is admissible by stipulation if the examiner is available for cross-examination. The court cited a case denying such admissibility and one allowing such evidence. The latter case is the now famous *State v. Valdez*, 91 Ariz. 274, 371 P.2d 894 (1962), which laid out numerous criteria for admission pursuant to stipulation. The *Potts* court did not adopt those standards, but cited the case as evidence of the on-going conflict between jurisdictions with respect to this issue. The court simply held, as in *Zazzetta*, that since the examiner is so pivotal in conducting the test and evaluating the results, that the offer of results without evidence of the expertise of the operator is plain error which affects the substantial rights of the defendant. We concur in the case to the extent to which it goes.

These cases spoke mainly to the issue of the qualifications of the polygraph examination and the quality of the examination as administered. They did not have present, as we have here, virtually all of the safeguards mentioned in the case law. And the State's effort to follow those guidelines is commendable.

Still, that cannot change the status of what we deem to be unreliable and untrustworthy evidence. All the best intentions and protections, as well as agreement by both parties, will not transform that evidence into anything else. The State can no more make a silk purse from a sow's ear than can the appellant. We agree with appellant's contention here, as it was so aptly expressed by the supreme court in *People v. Zazzetta*:

> "[I]t is inconsistent for a court to affirm the unreliability of lie-detector tests and at the same time admit into evidence the results of a stipulated test. If such tests are as unpredictable and misleading as the courts are so certain they are, then their reliability and usefulness to the court and jury upon the ultimate question of guilt or innocence remains the same, regardless if they are admitted by stipulation or not." 27 Ill. 2d 302, 308.

■■ We also hold that the admission of the polygraph test mandates a new trial in this cause. This is so because of its apparent conclusiveness to a jury. The admission of a polygraph test will have an "obvious prejudicial impact" on a jury. (*People v. Zazzetta*, 27 Ill. 2d 302, 309 (1963).) The polygraph test is unique in that its truth seeking functions nearly duplicate the purpose of the trial. *Akonom v. State*.

"There can be little question that from a jury standpoint, the polygraph test as interpreted by the expert is independent proof of what often are the most critical facts in the case, that is, the guilt of the defendant." (*State v. Frazier*, ___ W. Va. ___, ___, 251 S.E.2d 39, 47 (1979).)

"We are all aware of the tremendous weight such tests would necessarily have in the minds of a jury." *People v. Leone*, 25 N.Y.2d 511, 518, 255 N.E.2d 696, 700 (1969).

For the foregoing reasons, the judgment of the circuit court of St. Clair County is reversed and this cause is remanded for a new trial.

Reversed and remanded.

KARNS and KASSERMAN, JJ., concur.