STATE of Utah, Plaintiff and Respondent,

v.

Rudy Matthew REBETERANO, Defendant and Appellant.

No. 18428.

Supreme Court of Utah.

April 30, 1984.

Tom Jones, Salt Lake City, for defendant and appellant.

David L. Wilkinson, Atty. Gen., J. Stephen Mikita, Asst. Atty. Gen., Salt Lake City, for plaintiff and respondent.

STEWART, Justice:

The defendant, Rudy Rebeterano, was tried and convicted of second degree murder. On appeal he contends: (1) that the evidence is insufficient to support a verdict of guilty, and (2) that the trial court erred in admitting the results of the defendant's polygraph examination, which the parties had stipulated would be admissible.

## I. SUFFICIENCY OF THE EVIDENCE

■ In an attack on the sufficiency of the evidence, we view the evidence and the reasonable inferences therefrom in the light most favorable to the jury's verdict. *State v. Garcia*, Utah, 663 P.2d 60 (1983); *State v. Petree*, Utah, 659 P.2d 443 (1983); *State v. Daniels*, Utah, 584 P.2d 880 (1978). A jury verdict will not be set aside unless the evidence "is sufficiently inconclusive or [so] inherently improbable that reasonable minds must have entertained a reasonable doubt that the defendant committed the crime of which he was convicted." *State v. Petree, supra,* at 444. *Accord, e.g., State v. Anderton*, Utah, 668 P.2d 1258 (1983); *State v. Linden*, Utah, 666 P.2d 875 (1983).

The state's version of the facts, which the jury apparently accepted in substance, is as follows. The defendant is the ex-husband of Debbie Griffiths. On the evening of July 21, 1981, the defendant ate dinner with Griffiths at her motel apartment. He assisted in preparing the dinner by peeling potatoes with a knife. After dinner, Griffiths and her brother Richard went to a nearby bar and the defendant accompanied them. At the bar, Griffiths met the victim, Mike Johnston, for the first time. The two talked and played pool together. The defendant was visibly jealous. When the bar closed at 1:00 a.m., Griffiths and Johnston were in the bar talking, and the defendant had somehow been locked out. The defendant pounded on the door and yelled angrily. Griffiths testified that the defendant was upset because she was paying attention to Johnston.

At about 1:30 a.m., Griffiths and Johnston left the bar and went to the house of another person Griffiths had met that night. At about 5:30 a.m., Johnston drove Griffiths back to her apartment. Griffiths asked Johnston to escort her inside, because she feared that the defendant might be hiding there.[1] Upon entering, they discovered that the defendant was hiding there. He said to Johnston, "What the hell are you doing here?" Griffiths quickly left the apartment, and as she did, she heard scuffling and then a loud groan that sounded "like someone getting hit in the stomach."

After leaving the apartment, Griffiths ran under a bridge to the other side of the street. Looking back, she saw the defendant leave the apartment carrying a large white bundle, which he placed in the trunk of Johnston's car. He then got into the car and drove away. Mike Johnston was never seen again.

Griffiths called the police and two officers arrived at her apartment at 6:08 a.m. They found fresh blood splattered throughout the apartment. Blood from one large spot was determined to be type A the same as the victim's. The defendant's blood is type O. A white sheet had been removed from Griffiths' bed and kitchen knives were missing, including the knife that the defendant had used to peel potatoes the evening before.

Later that same day, July 22nd, the police discovered Johnston's car parked less than two blocks away from Johnston's apartment. The rear bumper was stained with blood which appeared to have been smeared from the inside of the trunk outward. Inside the trunk, a large puddle of fresh blood had soaked into the trunk mat. The blood was determined to be type A.

The police also discovered a Zippo lighter and two Pall Mall cigarettes at the side of the trunk. Johnston's roommate, Ronald Mason, testified that Johnston usually car-

---

**1.** On several prior occasions, the defendant had broken into Griffiths' previous apartments. She was afraid of defendant because he had previ-ously punched her in the face and given her a black eye.

ried that type lighter and cigarettes in his shirt pocket.

The trial testimony established that the defendant was extremely jealous of any man who paid attention to Griffiths. Griffiths testified that once, after their divorce, appellant had told her that if he ever caught her with another man, he would kill them both. A few months before the events of July 21 and 22, the defendant had attempted to run over a man who was helping Griffiths move some of her furniture.

On August 6, 1981, approximately two weeks after Johnston's disappearance, a maintenance worker at the motel found a knife on the motel roof. Griffiths identified it as the knife that the defendant had used to peel potatoes on the evening of July 21st. The knife blade had rusted, but a spot of blood was discovered on the handle. Analysis showed it to be either type A or type B human blood. When animal blood is typed, it is sometimes mistaken for type B human blood; therefore, if the knife had been used to cut meat, the blood from the meat could account for classifying the blood as type B human blood.

On the above evidence, the jury could have reasonably concluded that the defendant had intentionally killed Johnston.

The defendant argues that the evidence is insufficient to establish the death of a human being because Johnston's body was never found. For that reason, he contends that the *corpus delicti* of the crime was not established.

■ The State has the burden of proving the *corpus delicti* of a crime, i.e., that "the injury specified in the crime occurred, and that such injury was caused by someone's criminal conduct." *State v. Knoefler*, Utah, 563 P.2d 175 (1977) (footnote omitted). *Accord State v. Petree*, Utah, 659 P.2d 443 (1983); *State v. Kimbel*, Utah, 620 P.2d 515 (1980); *State v. Cazier*, Utah, 521 P.2d 554 (1974).

■ Apparently no case in Utah has decided whether production of a corpse is necessary in a homicide case to prove the *corpus delicti*. However, other jurisdictions, with which we agree, have uniformly held that a corpse is not necessary to establish the *corpus delicti* and that a death may be established by circumstantial evidence. *E.g., People v. Manson*, 71 Cal. App.3d 1, 139 Cal.Rptr. 275 (1977); *State v. Zarinsky*, 143 N.J.Super. 35, 362 A.2d 611 (1976), *aff'd* 75 N.J. 101, 380 A.2d 685 (1977); *Commonwealth v. Rhoads*, 225 Pa. Super. 208, 310 A.2d 406 (1973); *State v. Lung*, 70 Wash.2d 365, 423 P.2d 72 (1967); 40 Am.Jur.2d *Homicide* § 433 & n. 6 (1968). *See also* R. Perkins, *Criminal Law* 100–102 (2d ed. 1969). In *State v. Lung, supra,* at 371, 423 P.2d at 76, the court stated:

> To require direct proof of the killing or the production of the body of the alleged victim in all cases of homicide would be manifestly unreasonable and would lead to absurdity and injustice.

And in *State v. Zarinsky, supra,* 143 N.J. Super. at 55, 362 A.2d at 621, the court declared:

> Surely, the successful concealment or destruction of the victim's body should not preclude prosecution of his or her killer where proof of guilt can be established beyond a reasonable doubt.

In such cases, the prosecution's burden is a heavy one. In *State v. Knoefler,* Utah, 563 P.2d 175, 176 (1977), we stated: "An admission or a confession, without some independent corroborative evidence of the corpus delicti, cannot alone support a guilty verdict." Proof that the victim is actually dead, and that the death was caused by criminal means, must be supported by some evidence independent of any admission or confession by the defendant. *Id.; State v. Manson, supra; State v. Zarinsky, supra.* The mere disappearance of a victim would not ordinarily be sufficient to support a conviction.

■ In the instant case, even though the evidence was circumstantial, it was sufficient to establish that Mike Johnston was intentionally killed by criminal means. Griffiths' testimony of an altercation be-

tween defendant and Johnston; her observation of the defendant's placing a large, wrapped bundle in Johnston's car; the large amount of type A blood in Griffiths' apartment and in Johnston's car trunk along with the cigarettes and cigarette lighter which apparently had belonged to Johnston; the kitchen knife found on the roof of the motel; and the disappearance of Johnston all indicate that the defendant fatally stabbed Johnston and then disposed of his body.

## II. ADMISSIBILITY OF POLYGRAPH EVIDENCE

On August 13, 1981, the Brigham City police asked the defendant to submit to a polygraph examination. Before being examined, the defendant signed a written stipulation stating that he was aware that he was a suspect in the murder of Mike Johnston and that the results of the examination might be received into evidence for either the prosecution or the defendant. The stipulation was also signed by the defendant's counsel and the Box Elder County attorney.

The results of the examination were unfavorable to the defendant. The defendant answered "no" to the questions: "Did you stab Mike?" "Did you cut Mike with a knife?" The examiner concluded that the defendant was lying when he answered these questions. At trial, defendant objected to the admission of the polygraph evidence, and the trial court overruled the objection.

*State v. Abel*, Utah, 600 P.2d 994, 998 (1979) left open the question of whether polygraph test results may be admitted in the absence of a stipulation. However, Utah law allows polygraph evidence to be admitted when there is a valid stipulation binding both parties. *State v. Abel*, supra; *State v. Collins*, Utah, 612 P.2d 775 (1980); *State v. Jenkins*, Utah, 523 P.2d 1232 (1974); *State v. Rowley*, 15 Utah 2d 4, 386 P.2d 126 (1963). *See generally* Annot., *Admissibility of Lie Detector Test Taken upon Stipulation That the Result Will Be Admissible into Evidence*, 53 A.L.R.3d 1005 (1973).

The defendant characterizes these cases as perpetuating a "Dinosaur Rule" that we should now overrule. He cites several decisions from other jurisdictions which make polygraph test results *per se* inadmissible, regardless of the parties' stipulation. *E.g.*, *People v. Monigan*, 72 Ill.App.3d 87, 28 Ill.Dec. 395, 390 N.E.2d 562 (1979); *Akonom v. State*, 40 Md.App. 676, 394 A.2d 1213 (1978). *See also* cases discussed in Annot., *supra*, 53 A.L.R.3d 1005 § 3 (1973).

The Utah rule is neither fossilized nor is it approaching extinction. The above-cited annotation shows that more courts admit stipulated polygraph results than exclude them. However, certain conditions must be met before stipulated polygraph results may be admitted. The defendant's participation in the examination must be free and voluntary, and the trial court must have the discretion to exclude the evidence if it finds that the examiner was not qualified or that the conditions under which the test was given were unfair. The defendant must be allowed to cross-examine the examiner as to his expertise, the reliability of polygraph exams, the accuracy of the apparatus used, and all other points that bear on the accuracy of the polygraph in the particular case and in general. In addition, the jury should be instructed that the examiner's testimony as to the results of the test is not conclusive, but is to be taken only as expert opinion. *E.g.*, *State v. Thompson*, 37 N.C.App. 651, 247 S.E.2d 235 (1978); *State v. Ross*, 7 Wash.App. 62, 497 P.2d 1343 (1972); *State v. Valdez*, 91 Ariz. 274, 371 P.2d 894 (1962). *See generally* Annot., 53 A.L.R. 1005 (1973). Defendant does not contend that any of these conditions were violated.

The defendant also argues that polygraph results should be inadmissible because they have not as yet "attained scientific acceptance as a reliable and accurate means of ascertaining truth or deception

and no stipulation can cure that defect." However, polygraph tests properly administered do have a degree of reliability.[2] Defendant is, of course, correct in pointing out that a stipulation lends no greater degree of accuracy to the test. We noted that point in *State v. Abel, supra,* at 997:

[I]t is, of course, clear that a stipulation does not in any way establish the reliability or accuracy of polygraph test results. However, it does embody an important notion of fairness for those parties who consider the polygraph reliable and are willing to rely on it. A stipulation forecloses one party from preventing admission of an adverse test after he and the opposing party have agreed it would be admissible, simply because he does not like the results.

On appeal, the defendant does not attack the fairness of the polygraph test in this case. He does not contend that the stipulation was not properly signed; that his consent to the test was not voluntary; that the polygraph examiner was not qualified; that the test was improperly interpreted; or that the test was otherwise unfair or inaccurate. The trial court did not err in admitting the polygraph evidence.

Affirmed.

HALL, C.J., and OAKS, HOWE and DURHAM, JJ., concur.

---

**2.** Generally the accuracy depends on the skill of the examiner. In various studies, accuracy has ranged from a low of 75% to a high of 93.9%. J. Reid & F. Inbau, *Truth and Deception* 389– 402 (2d ed. 1977). Given a skilled examiner, the accuracy is likely to be in the upper range of the statistics cited.