# MICHAEL AKONOM AND JOSHUA GREGG *v.* STATE OF MARYLAND

[No. 92, September Term, 1978.]

*Decided December 6, 1978.*

The cause was argued before MORTON, MOORE and MACDANIEL, JJ.

*Martha G. Villmoare, Assistant Public Defender,* with whom was *Alan H. Murrell, Public Defender,* on the brief, for appellants.

*Stephen B. Caplis, Assistant Attorney General,* with whom were *Francis Bill Burch, Attorney General, William A. Swisher, State's Attorney for Baltimore City,* and *Charles Lamasa, Assistant State's Attorney for Baltimore City,* on the brief, for appellee.

MORTON, J., delivered the opinion of the Court.

Appellants, Michael Akonom and Joshua Gregg, were tried jointly [1] before a jury in the Criminal Court of Baltimore (Allen, J.) on two separate counts of murder and related handgun offenses. The jury found each of them guilty on two counts of first degree murder and also returned guilty verdicts on all outstanding handgun charges.[2] Two consecutive life sentences were imposed for the murder convictions.

The charges stemmed from the shooting deaths of Malcolm Crawley and Bland Gatewood on June 25, 1976, at Crawley's home. There is no question that the victims and appellants knew each other. There was testimony indicating that Akonom had previously been "set up" by Gatewood in an abortive narcotics arrest and that Gregg had once been charged with assaulting Crawley. It is clear from the record that appellants were in the neighborhood at the approximate time of the shootings and there was evidence that appellant Akonom was in possession of a .45 caliber handgun on the day of the murders. Ballistics evidence showed that the victims were killed by .45 caliber bullets. The actual murder weapon, however, was never discovered.

The crucial fact for the purposes of this appeal is that on July 9, 1976, appellant Gregg, after several hours of questioning, voluntarily submitted to a polygraph examination at Baltimore City police headquarters. He also gave police a signed statement in which he denied involvement in the murders. On neither occasion was he represented by counsel. Prior to the polygraph examination, Gregg signed a "stipulation" agreeing that in the event of a trial, either the State or the defense could introduce the test results, provided the results were "conclusive." The record also indicates that Gregg was advised of his constitutional rights prior to his statement and prior to the polygraph examination.

---

1. Prior to trial, Akonom's motion for severance was denied.
2. Gregg's motion for judgment of acquittal was granted with respect to charges of carrying a handgun.

The examination was administered by Larry Howell, an employee of the Baltimore City Police Department who received training in polygraphy during his service with the United States Army. Howell, whom the court qualified as an expert witness, testified at trial that the examination consisted of a combination of "relevant" questions concerning the crime, irrelevant questions and control questions. Deceptive answers to control questions are anticipated. They are intended to aid the examiner in determining the reactibility of the subject.

The four "relevant" questions were:

1. Were you there in the house when Malcolm and Bland were shot?
2. Do you know for sure who shot Malcolm and Bland?
3. Were you involved in Malcolm and Bland's death in any way?
4. Do you know what happened to the gun after the shooting?

Howell testified that Gregg answered "no" to all four of the relevant questions. He further testified that the polygraph results indicated that Gregg's responses to the first three relevant questions were "untruthful," but that Gregg was "telling the truth" when he responded negatively to the fourth question.

It is in this factual posture that appellants contend that the admission of testimony concerning the results of Gregg's polygraph examination constituted reversible error as to both appellants' convictions notwithstanding that Gregg volunteered to subject himself to the examination and agreed that the results could be used by the State or himself regardless of the outcome.

We announced in *Rawlings v. State,* 7 Md. App. 611 (1969), a case of first impression, that we would follow the general rule that polygraph evidence is inadmissible, but we did not reach the question of the effect of a stipulation between the State and the defense upon the admissibility of such evidence.

We have since cited *Rawlings* with approval in *Smith v. State,* 31 Md. App. 106, 120 (1976); *Smith v. State,* 20 Md. App. 577, 594 (1974); *Wilson v. State,* 20 Md. App. 318, 334 (1974).

In adopting the rule of inadmissibility as enunciated by the Supreme Court of New Hampshire in *State v. LaForest,* 207 A. 2d 429 (1965), this Court stated in *Rawlings, supra,* 614:

> "We have examined all available authorities and have concluded that at this stage in the science or the art of lie detecting, the rationale of the general rule expressed above represents the sounder approach to the issue."

The New Hampshire court noted that while the polygraph is a valid investigative tool, "[n]evertheless the results of these tests have been rejected by the courts as evidence of guilt or innocence of the accused by the overwhelming weight of judicial authority on the ground that these tests have not yet attained sufficient scientific acceptance as an accurate and reliable means of ascertaining truth or deception . . . ." *LaForest, supra,* 430. More recently, we observed in *Johnson v. State,* 31 Md. App. 303, 307 (1976), that "[t]he reason for excluding the results of a polygraph examination is the questionable reliability of such evidence."

The State, however, argues strenuously that the stipulation in the instant case disposes of the admissibility problem. It is clear from the record that the trial judge admitted the evidence on this basis. Judge Allen stated: "The issue . . . here is not the admissibility of lie detector tests vel non, but the issue of a lie detector test after a stipulation . . . ."

In support of its contention, the State relies heavily upon *State v. McDavitt,* 297 A. 2d 849 (N.J. 1972) and *State v. Valdez,* 371 P. 2d 894 (Ariz. 1962). In those cases, the highest courts of New Jersey and Arizona, while acknowledging the general rule against admissibility of polygraph evidence, held such evidence admissible upon stipulation by the parties provided there is a factual showing that the stipulation is clear, complete, and voluntary and that the test is administered by a competent examiner using established polygraph techniques.

We find these cases unpersuasive and would venture to suggest that they are guilty of putting the cart before the well-known horse. As we see it, the crucial issue is whether, as a matter of law, this type of evidence is sufficiently reliable or trustworthy. It cannot logically be argued that a stipulation enhances in any significant way the inherent reliability of evidence produced by a so-called scientific process or art. *See, e.g., Pulakis v. State,* 476 P. 2d 474, 479 (Alaska, 1970). Even proponents of the use of polygraph evidence admit that a stipulation does not increase its reliability. One strong supporter suggests that "when a court admits polygraph evidence upon stipulation, it is probably because of a tacit belief in the accuracy of the technique." Tarlow, *Admissibility of Polygraph Evidence in 1975: An Aid in Determining Credibility in a Perjury-Plagued System,* 26 Hastings L.J. 917, 956 (1975). Thus, while we are generally reluctant to invalidate agreements entered into by the parties, we view this as one of the unusual occasions when we are obligated to do so. *See generally* Annot., Relief From Stipulations, 161 A.L.R. 1161; *Peddicord v. Franklin,* 270 Md. 164, 175 (1973).

As the Supreme Court observed in *Young v. United States,* 315 U. S. 257, 259 (1942), "the proper administration of the criminal law cannot be left merely to the stipulation of the parties." The *Young* dictum seems particularly apt in this instance where the stipulated polygraph evidence comprised the heart of the State's case against Gregg. In fact, Detective Steve Danko of the Baltimore City Police Department testified that Gregg would never have been charged if he had "passed" the polygraph test. Accordingly, we decline to sanction the use of evidence produced by an allegedly scientific device unless it is first demonstrated that the underlying process is scientifically reliable.[3]

3. We are aware that courts often accept evidence, otherwise objectionable, on the basis of a stipulation or (in criminal law) under the doctrines of waiver or lack of standing, but in virtually all such instances the evidence in question satisfies judicial standards of reliability. The "harmless error" doctrine also provides an interesting analogy: while the admission of evidence tainted by an illegal search may be "harmless," the introduction into evidence of a coerced confession requires automatic reversal, at least in part because of the theory that its origin renders it highly unreliable. *See, e.g.,* Jackson v. Denno, 378 U. S. 368, 386 (1964).

The proper evaluation of polygraph evidence, irrespective of any stipulation, is a difficult task. In adhering to the exclusionary policy laid down in *Rawlings, supra,* and its successors, we see nothing in the recent decision of the Court of Appeals in *Reed v. State,* 283 Md. 374 (1978), which obliges us to reconsider our prior position. The *Reed* case set forth, for the first time in Maryland, a uniform standard for judging the admissibility of scientific evidence. That standard is the test articulated in the landmark case of *Frye v. United States,* 293 F. 1013, 1014 (D.C. Cir. 1923), where the court found that evidence produced by a crude forerunner of the modern polygraph was insufficiently reliable and therefore inadmissible:

> " 'Just when a scientific principle or discovery crosses the line between the experimental and demonstrable stages is difficult to define. Somewhere in this twilight zone the evidential force of the principle must be recognized, and while courts will go a long way in admitting expert testimony deduced from a *well-recognized* scientific principle or discovery, the thing from which the deduction is made must be *sufficiently established to have gained general acceptance in the particular field in which it belongs.* (Emphasis supplied.)' " *Reed, supra,* 381.

Elaborating on the *Frye* test, the Court of Appeals stated:

> "* * * [B]efore a scientific opinion will be received as evidence at trial, the basis of that opinion must be shown to be generally accepted as reliable within the expert's particular scientific field. Thus, according to the *Frye* standard, if a new scientific technique's validity is in controversy in the relevant scientific community, or if it is generally regarded as an experimental technique, then expert testimony based upon its validity cannot be admitted into evidence.

> The identity of the relevant scientific community is, of course, a matter which depends upon the particular technique in question. In general,

*members of the relevant scientific community will include those whose scientific background and training are sufficient to allow them to comprehend and understand the process and form a judgment about it.* " (Emphasis supplied.) *Reed, supra,* 381-82.

Hence, it is clear under *Reed* that the relevant "field" in which the polygraph belongs is not limited to those who practice the science (or art) of polygraphy, but extends into the larger scientific community as well. This conclusion is in accord with *Frye,* where it was determined that a primitive lie detector test lacked sufficient "standing and scientific recognition among physiological and psychological authorities." *Frye, supra,* 1014.

Upon rejecting the contention that the trier of fact might determine the validity and weight of scientific evidence on a case by case basis and decrying the inconsistencies that would inevitably result from such a practice, the Court of Appeals restated the *Frye* rule in the following terms:

"As long as the scientific community remains *significantly divided,* results of controversial techniques will not be admitted, and all defendants will face the same burdens." (Emphasis added.) *Reed, supra,* 388.

Unfortunately, the record before us does not provide an adequate basis for determining whether the polygraph has gained "general acceptance in the scientific community" under the *Frye-Reed* test. The only "expert" testimony in the present case came from the polygraph examiner himself, an individual apparently qualified in polygraphy but without any broader scientific training. Moreover, as we noted earlier, the trial judge mistakenly assumed that the stipulation made it unnecessary to rule on the threshold issue of the admissibility of the disputed evidence.

There is, of course, a very large body of material on the subject of polygraph testimony. In our examination of the case law as well as numerous articles in law reviews and

professional journals,[4] we have found no discussion of the subject more thoroughly researched or persuasively reasoned than the recent opinion of the Supreme Court of Michigan in *People v. Barbara,* 400 Mich. 352, 255 N.W.2d 171 (1977). In *Barbara,* the Michigan court, applying both the *Frye* test and Michigan's own variant of that test,[5] reaffirmed its long-standing rejection of polygraph evidence in all trials, including evidence submitted pursuant to stipulation.[6] *Barbara* relaxed the polygraph ban to the very limited extent that judges were granted discretion to consider polygraph results if offered by a defendant in a post conviction proceeding for a new trial. The court was careful to point out that under these strict limitations, "the polygraph examination would not itself be evidence," but would merely be used "to buttress the credibility of new witnesses," *Barbara, supra,* 173, and "would not set a pattern for admissibility at trial," *id.* at 199.

It is undisputed that the polygraph has made significant progress since the time of *Frye* and that it is now widely used as an investigative tool by law enforcement agencies and private industry. *See, e.g., Barbara, supra,* 193; *U. S. v. Wilson,* 361 F. Supp. 510, 511 (1973). Proponents of the use of the polygraph in the court room point to studies indicating that the tests are accurate upwards of 90 percent of the time.

---

4. Among the many helpful commentaries are: Abbell, Polygraph Evidence: The Case Against Admissibility in Federal Criminal Trials, 15 Am.Crim.L.Rev. 29 (1977); Annot., Physiological or Psychological Truth and Deception Tests, 23 A.L.R. 2d 1306; Annot., Polygraph: Stipulation of Admissibility, 53 A.L.R. 3d 1005; Burkey, The Case Against the Polygraph, 51 A.B.A. J. 855 (1965); Forkosch, The Lie Detector and Mechanical Jurisprudence, 28 Okla.L.Rev. 288 (1975); Highleyman, The Deceptive Certainty of the Lie Detector, 10 Hastings L.J. 47 (1958); Levitt, Scientific Evaluation of the Lie Detector, 40 Iowa L.Rev. 440 (1955); Lykken, Psychology and the Lie Detector Industry, 29 Am. Psychologist 725 (1974); Note, Pinocchio's New Nose, 48 N.Y.U.L.Rev. 339 (1973); Note, The Emergence of the Polygraph at Trial, 73 Col.L.Rev. 1120 (1973); Reid and Inbau, Truth and Deception: The Polygraph Technique (Baltimore, Williams & Wilkins Co., 1966); Skolnick, Scientific Theory and Scientific Evidence: An Analysis of Lie Detection, 70 Yale L.J. 694 (1961).

5. In People v. Davis, 343 Mich. 348, 370, 72 N.W.2d 269 (1955), the Michigan court stated that the prerequisites for the admissibility of polygraph evidence were "general scientific recognition" of the tests and a showing that "reasonable certainty" follows from them.

6. On the stipulation point, *see* Stone v. Earp, 331 Mich. 606, 611, 50 N.W.2d 172 (1951).

684

The problem with such claims is that the figures have been supplied by polygraphers and generally lack verification by relevant scientific disciplines. On this point, the Michigan Supreme Court remarked upon the "difficulty in empirically verifying polygraphic findings" as well as the existence of "some questions concerning the accuracy figures." *Barbara, supra* 189. The court further observed:

> "The fact is, that the results of most polygraph examinations are not verified by extrinsic evidence, and there are no scientific studies performed by other than polygraphers which purport to demonstrate scientific means of verification. This factor alone has been responsible for much of the anti-polygraph sentiment outside the polygraph profession." *Id.*

*See also U. S. v. Wilson,* 361 F. Supp. 510, 514 (D. Md. 1973), where after two days of expert testimony, the federal District Court for Maryland concluded: "[T]he fundamentally psychological component of the examination, the subjectivity of interpretation, and the incipient stage of experimental research, preclude the finding of a particular degree of probability of accuracy of a polygraph examination. Thus, it is impossible at this time to assess the substantiality of the degree of error in the polygraph process."

In any event, acceptance among polygraphers is clearly not the "general acceptance" required under the *Frye-Reed* test and acceptance among psychologists and psysiologists "cannot be demonstrated, because such acceptance does not exist." [7]

Another serious concern of scientists and jurists alike is the critical role of the examiner in polygraph testing. Discussing

---

7. Barbara, *supra,* 187. *See also* U.S. v. DeBetham, 348 F. Supp. 1377, 1381 (S.D. Cal. 1972). In addition, one well-known text by psychophysiologists states, "No adequate evaluation of the validity of the polygraph * * * is yet available." Orne, Thackray, and Paskewitz, On the Detection of Deception, in Handbook on Psychophysiology 750 (Greenfield and Sternbach eds. 1972).

this problem in *U. S. v. Wilson, supra,* 512, Judge Young stated:

> "A study of the theory and process of the polygraphy examination reveals complexities not present in the fields of fingerprint, handwriting, voiceprint, ballistics and neutron activation analysis, all of which are based on the identity or behavior of physical phenomena. The experts and studies differ as to the capability of the polygraph industry to cope with these complexities, but none would dispute their existence. The distinction is that polygraphy, albeit based on a scientific theory, remains an art with unusual responsibility placed on the examiner. The acquainting of the examiner with the subject matter is often a source of improper suggestion, conscious or subconscious. The preparation of the test and the discussion with the examinee of the polygraph procedure furnishes additional opportunity for improper subjective evaluation."

If one thing is clear from the great mass of literature on polygraph testing, it is that the scientific community is still "significantly divided," *Reed, supra,* 388, in its opinion concerning the validity of the technique. While this conclusion by itself dictates that polygraph evidence must remain inadmissible, there are other serious problems associated with its use. These problems often result from the fact that the polygraph device is unique in that its truth-seeking function nearly duplicates the purpose of trial. Additional policy arguments that have been advanced include:

> "(1) that the jury will put inordinate weight on the testimony of the examiner, (2) that, although the testimony of a ballistics or fingerprint expert is usually significant, 'a demonstrated lie or truth to the question "Did you kill X?" would invariably be perfectly conclusive'; (3) that examination results offered unilaterally by the defendant would always be favorable to him and his opponent would not be able to examine him under the lie-detector, nor to

cross-examine him should he refuse to take the stand; (4) that, even where the defendant consents to take an examination, while incarcerated the conditions under which the consent is obtained and the examination is given may be a factor in producing results unfavorable to the defendant; (5) that the presumption of innocence may be threatened by the inordinate weight likely to be given to failing to take a polygraph examination once such examination results are generally admitted * * *." (Footnotes omitted.) Note, *Problems Remaining for the "Generally Accepted" Polygraph,* 53 B.U.L.Rev. 375, 377 (1973).

*See also* testimony of Henry S. Dogin, Deputy Assistant Attorney General before the House Committee on Government Operations, reported in 16 Crim. L.Rep. (BNA) 2306 (1975). It should be noted that the U. S. Justice Department has adopted a firm policy opposing the use of polygraph evidence at trial. *See* Abbell, *Polygraph Evidence: The Case Against Admissibility in Federal Criminal Trials,* 15 Am.Crim.L.Rev. 29, 30 (1977).

We are also troubled by other likely effects of institutionalizing polygraph testing. Were private practices to spring up, some defendants might "shop around" until they passed an examination without divulging prior unsuccessful tests. On the other hand, the indigent defendant would be unable to "take an examination without the government's financing and knowledge." *Wilson, supra,* 514.

For these reasons, we believe not only that polygraph evidence fails to meet the *Frye-Reed* standard of "general acceptance," but also that its admission is certain to be highly prejudicial because of its apparent conclusiveness.[8] We are therefore compelled to reverse the conviction of appellant Gregg, whose polygraph examination was a principal component of the State's case.

---

8. Two studies of juror reaction to polygraph evidence indicate that the test results would be regarded by some jurors as conclusive. *See* Kaplan, Lie Detector: An Analysis of Its Place in the Law of Evidence, 10 Wayne L. Rev. 381, 386 (1964). *But see* Tarlow, *supra,* 968-69.

It is a harder question with respect to appellant Akonom. Although the jury was cautioned that the polygraph evidence was to be considered only against Gregg, we have grave doubts about the efficacy of such an instruction under the circumstances of this case. The State's theory was that the defendants, two friends motivated by revenge, acted in concert in the killings of the two victims. While the circumstantial evidence against Gregg was weak, the State's case was stronger against Akonom, who admitted being in possession of a handgun in the home of one of the victims shortly before the shootings.

The clear import of the polygraph evidence was, however, that Gregg was present at the shootings, that he knew who actually shot the victims and that he was personally involved in their deaths. Given the State's theory of the case, it is hard to imagine how this evidence could be considered in any way that was not prejudicial to Akonom, particularly in light of Gregg's allegedly "truthful" response denying knowledge of the whereabouts of the gun after the shooting.

We conclude therefore that the introduction of the polygraph evidence was necessarily so prejudicial as to warrant the reversal of both appellants' convictions. In view of our conclusion, we do not reach the remaining issues presented in this appeal.

> *Judgments reversed as to both appellants; case remanded for a new trial; costs to be paid by the Mayor and City Council of Baltimore.*