577 A.2d 386

**Craig Alan KAIRYS**

v.

**DOUGLAS STEREO INCORPORATED t/a "The Wiz" et al.**

**No. 1760, Sept. Term, 1989.**

Court of Special Appeals of Maryland.

July 5, 1990.

**668**

Steven R. Buckner (Caplan, Wechsler, Selzer & Buckner, Chartered, on the brief), Bethesda, for appellant.

Richard E. Schimel (Budow and Noble, P.C., on the brief), Bethesda, for appellees, Douglas Stereo, Inc. and Lew Rosenfeld.

Daniel Karp and Allen, Johnson, Alexander & Karp, on the brief, Baltimore, for appellee, Thomas Moore.

Submitted before WILNER, WENNER and CATHELL, JJ.

WILNER, Judge.

Appellant, Craig Kairys, sued his former employer, Douglas Stereo Incorporated (Douglas), Douglas's general manager Lewis Rosenfeld, and a polygraph operator named

Thomas Moore in the Circuit Court for Prince George's County. The action arose from the aftermath of a theft that occurred at the Douglas store in the Iverson Mall on April 12, 1987. On April 30, 1987, Mr. Kairys was arrested and charged with that theft. The charge was nol prossed by the State on November 19, 1987, because the prosecutor felt she had insufficient evidence.

Two months later, Kairys filed this action. In an amended and second amended complaint, he charged Douglas with malicious prosecution (Count I), abuse of process (Count III), and wrongful discharge (Count IV); he charged Douglas and Rosenfeld together with defamation (Count II) and false imprisonment (Count VI); and he charged all three defendants with civil conspiracy (Count V). Eventually, the court entered summary judgment in favor of the respective defendants on all counts but Count IV, which Kairys then voluntarily dismissed. In this appeal, Kairys contends that there was a genuine dispute of material fact as to each count ruled upon by the court and that summary judgment was therefore inappropriate.

## BACKGROUND

Douglas is in the business of selling tapes, records, and stereo equipment. In 1987, it had eight stores, one of which was located in the Iverson Mall. Mr. Rosenfeld was the general manager of Douglas; Mr. Kairys was the acting manager of the Iverson Mall store.

On the evening of Sunday, April 12, 1987, Mr. Kairys called Mr. Rosenfeld to inform him that a bag of money was missing from the store. There apparently was a shortage in the deposit of Saturday's receipts and Kairys was unable to find the missing bag. Eventually, it turned out that approximately $3,800 in cash and $1,500 in checks and credit card receipts were missing. What occurred thereafter, as reflected in the record before us, comes from the deposition testimony of Mr. Rosenfeld, Mr. Kairys, Mr. Moore, Glen Clark, the head of security at Iverson Mall, and

Detective Michael Brady, of the Prince George's County Police Department.

There was a floor safe in the back of the store to which the store managers had the combination. Someone had written the combination on a piece of wood located about two feet from the safe, however. When Kairys initially reported the bag missing, he told Rosenfeld that he was "almost sure" that he had put the bag in the safe and that a former employee, one Gerald Warfield, had been in the store on Saturday, that Warfield had used the bathroom, which was right next to the room where the safe was located, and that Warfield could have gotten the combination from the piece of wood. The next day (Monday, April 13), Rosenfeld went to the store, had another search made for the missing bag, and spoke with Kairys, another employee, Richard Walls, and Mr. Clark. According to Rosenfeld, Mr. Walls told him that "he did not see the money go into the safe. He saw the money in the manila envelope in a folder alongside the counter on the floor," that "[a]fter [Kairys] had gone through the money, he put it down in an envelope alongside the counter on the floor."

Rosenfeld said further that, during his second conversation with Kairys on April 12, Kairys volunteered, indeed "wanted" to take a polygraph test. He said that Walls also indicated a willingness to submit to such an examination. He thereupon arranged to have Kairys, Walls, and three other employees examined by Mr. Moore.

Kairys had undergone a pre-employment polygraph examination by Moore in January, 1987. He underwent two more as a result of this incident, one on April 14 and one on April 21, 1987. On each of these occasions, he signed a consent form acknowledging that he requested the examination without duress, coercion, or promise of reward, that he understood that, under State law, an employer could not require any person to take a polygraph examination as a condition of employment or continued employment, and that "the taking of this polygraph examination is not a condition of my continuing in the employ of [Douglas]...." Accord-

ing to Mr. Moore, when Kairys appeared on the 14th, he said that he "was anxious to get to the bottom of this and to take the test."

Following the April 14 examination, Moore said that he probably called either Mr. Rosenfeld or Douglas Jemal, an owner of Douglas. In a subsequent written report to Jemal, he opined that

"Mr. Kairys displayed physiological responses indicative of the established criteria for a subject PRACTICING DECEPTION when affirmatively replying to the following relevant question:

9.A. 'Do you know for sure that you placed that missing deposit into the safe on Sunday, April 12th, 1987?'

It is the undersigned examiner's opinion that Mr. Kairys DID PRACTICE DECEPTION and was UNTRUTHFUL when answering 'yes' to the aforementioned relevant question."

It appears that Mr. Rosenfeld was informed of Moore's opinion and that he relayed it to Kairys, who thought "it was full of crap." That led to the follow-up examination of April 21. As to that, Mr. Moore reported to Mr. Jemal on April 23 that:

"Mr. Kairys displayed deception to the following relevant questions:

3. 'Did you unlawfully take any of that missing money from that $5,299.00 deposit?'

5. 'Did you unlawfully take any of that missing money from that $5,299.00 deposit that is missing from the Iverson Wiz since April 11th or 12th, 1987?'

8. 'Do you know for sure who took any of that missing money from that $5,299.00 deposit?'

9. 'Do you know for sure how any of that missing money from that $5,299.00 deposit was spent?'

It is the undersigned examiner's opinion that Mr. Kairys DID PRACTICE DECEPTION and was UNTRUTHFUL when answering 'no' to the aforementioned relevant questions."

Mr. Rosenfeld had reported the theft to the county police on April 13, but he had no significant contact with the police until the 23rd, when he met with Detective Brady. Rosenfeld said that he did not suspect Kairys of having committed the theft until he learned of the results of the polygraph examinations, in which the only deceptions reported were with respect to Kairys. When he met with Detective Brady, he then suspected Kairys and told Brady so. He also gave Brady Mr. Moore's telephone number. According to Rosenfeld, Detective Brady expressed the belief that Kairys should be arrested.

Detective Brady stated that Rosenfeld had told him that only Kairys had access to the safe and that, based on the results of the polygraph examinations, he believed that Kairys was responsible for the theft. Rosenfeld did not disclose that the combination to the safe was written on a piece of wood near the safe or Kairys's statement that Mr. Warfield had been in the store and in proximity to the safe. Brady said that he relied on Rosenfeld's investigation of the matter and asked whether Rosenfeld wanted Kairys arrested—a question Brady said he asks any victim—and Rosenfeld said that he did. Rosenfeld denied making any request that Kairys be arrested. Brady made no further investigation, other than to leave word for Mr. Moore to call. He said that he made no investigation of anyone else because the other persons subjected to a polygraph examination showed no deception, according to Mr. Moore's report. On April 29, Brady applied for a warrant and filed a Statement of Charges against Kairys. A warrant was issued and Kairys was arrested the next day.

Some sort of pre-trial proceeding was conducted on August 12, 1987. Mr. Rosenfeld, who was present, instructed his attorney to offer to drop the criminal charge in return for a release. According to Rosenfeld, "I didn't want to see anybody get in any trouble, and I just told [the attorney] to try to get the whole thing ended then." Kairys refused to sign a release, and so the case was not dropped at that point. It was dropped on the day of trial, November 19,

1987, however, because, as we stated, the prosecutor felt that there was not enough evidence to proceed.

## DISCUSSION

Because the case was disposed of on summary judgment, we need to view the relevant facts, and all inferences that can properly be drawn from those facts, in a light most favorable to Mr. Kairys. Only if, in so doing, we find that there was no genuine dispute of material fact and that the defendants were entitled to judgment as a matter of law may we affirm.

### *Malicious Prosecution*

■ To establish a case of malicious prosecution of a criminal charge, the plaintiff must show: (1) that a criminal proceeding was instituted or continued by the defendant against the plaintiff; (2) that it terminated in favor of the plaintiff; (3) the absence of probable cause for the proceeding; and (4) malice, i.e., that a primary purpose in bringing the proceeding was other than that of bringing an offender to justice. *Exxon Corp. v. Kelly,* 281 Md. 689, 693, 381 A.2d 1146 (1978). Certainly, the evidence here sufficed, for summary judgment purposes, to establish the first two elements. The fourth, for summary judgment purposes, depends on the third, for it seems to be settled law that, if the plaintiff establishes the lack of probable cause, "malice may be inferred." *Owens v. Graetzel,* 149 Md. 689, 696, 132 A. 265 (1926); *Exxon Corp. v. Kelly, supra,* 281 Md. at 699, 381 A.2d 1146. The issue, then, is whether the "evidence" before the court sufficed to show a lack of probable cause on the part of Douglas.

■ In this context, probable cause means "a reasonable ground of suspicion supported by circumstances sufficiently strong in themselves to warrant a cautious [person] in believing that the accused is guilty." *Banks v. Montgomery Ward & Co.,* 212 Md. 31, 39, 128 A.2d 600 (1957); *Palmer Ford, Inc. v. Wood,* 298 Md. 484, 493, 471 A.2d 297

(1984). The focus, said the *Palmer Ford* Court, at 495, 471 A.2d 297, "is on those facts known to, and genuinely believed by, the one initiating or continuing the prosecution when it is initiated or continued." In this instance, that means Mr. Rosenfeld.

■ Rosenfeld had essentially four pieces of information indicating Kairys's possible culpability at the time he "requested," in Brady's words, Kairys's arrest. First, he knew that Kairys, as acting manager of the store, had control of the money and access to the safe. Second, he knew that another employee, Walls, had reported seeing Kairys with an envelope of money that he put on the floor rather than in the safe. Third, he knew that, of all the employees in the store on April 12, including Walls, only Kairys was reported to have been deceptive in a polygraph examination. And fourth, he knew that the alleged deception bore on questions relating to whether Kairys took the money. Against this, he was aware that (1) Kairys had initially reported the missing bag, (2) the combination to the safe was written on a board near the safe and may have been visible to other people, and (3) Kairys had placed another person, Warfield, in the general vicinity of the safe.

In reaching the conclusion that Kairys was probably the culprit, Rosenfeld relied principally on the results of the polygraph tests. That raises the interesting and hitherto unexplored question of whether he had a right to rely on those results.

Both the Court of Appeals and this Court have held on a number of occasions that the results of polygraph examinations are inadmissible as evidence because the reliability of the technique itself has not been satisfactorily established. *See Lusby v. State,* 217 Md. 191, 141 A.2d 893 (1958); *Kelley v. State,* 288 Md. 298, 418 A.2d 217 (1980); *Guesfeird v. State,* 300 Md. 653, 480 A.2d 800 (1984); *Johnson v. State,* 303 Md. 487, 495 A.2d 1 (1985), *cert. denied* 474 U.S. 1093, 106 S.Ct. 868, 88 L.Ed.2d 907 (1986); *Department of Public Safety v. Scruggs,* 79 Md.App. 312, 556 A.2d 736

(1989). This evidence is rejected, in other words, because it has not been shown to have judicially cognizable probative value. It may not be received even at an administrative hearing, where the rules of evidence are relaxed, *Department of Public Safety, supra,* or upon stipulation. *Akonom v. State,* 40 Md.App. 676, 394 A.2d 1213 (1978), *cert. denied* 284 Md. 741 (1979).

In reaching these conclusions, we have recognized, as have other courts, that polygraph examinations are often used for investigative purposes both by police agencies and in general commerce. *See Akonom* and *Department of Public Safety,* both *supra.* But there is a limit to that as well. Detective Brady, for example, acknowledged that, although the Prince George's County police use polygraph examination results, "[w]e use it just to assist. It is not probable cause. It is just another tool." More important, Md.Ann.Code art. 100, § 95, with exceptions not relevant here, prohibits employers from requiring their employees to submit to a polygraph examination as a condition of continued employment. Although there was substantial evidence here that Kairys was not "required" to submit to the examinations but indeed did so at his own suggestion, there was also evidence to the contrary. In his deposition testimony, Kairys stated that Rosenfeld had told him that he would have to take the polygraph examination "to keep my job." Specifically:

"Q. Were you told that if you didn't take it you would be fired?

A. Yes."

Detective Brady gave some corroboration to Kairys's position:

"Q With respect to the lie detector test, did Mr. Rosenfeld indicate to you how it came to be that Mr. Kairys and, for that matter, Mr. Walls took lie detector tests? Did he indicate to you that he required them to take the test?

A He told me it was part of company policy."

Resolving the conflict on that point, as we must, in Kairys's favor, we must assume that Rosenfeld directed at least him, and possibly Walls as well, to take the examination in violation of the statute and the public policy underlying it. Whatever might otherwise be the permissible uses of polygraph examination results outside the judicial or administrative dispute resolution process, we could hardly countenance using such results when obtained in direct violation of law. That is especially so when the object of their use is to provide a basis for the institution of criminal charges. Coupling this public policy consideration with the judicially-pronounced unreliability of this kind of information, we conclude that the results of Kairys's polygraph examinations cannot be used in determining probable cause. If we exclude that information, it is evident, even from Rosenfeld's own lips, that probable cause did not exist to believe that Kairys was the thief.

### Defamation

Kairys's claim for defamation was based on the averment that, "on or about April 12, 1987," Rosenfeld, as agent for Douglas, stated to Detective Brady and others that Kairys "was a thief" and had stolen in excess of $3,800 from Douglas. The statement made to Detective Brady, he contends, was false and was made with malice in that Rosenfeld "had no knowledge that [Kairys] had committed the crime of theft and made said statement with reckless indifference as to whether the aforesaid statement was true or accurate."

In summary, to establish a case of defamation, the plaintiff must show (1) that the defendant made a defamatory communication—i.e., that he communicated a statement tending to expose the plaintiff to public scorn, hatred, contempt, or ridicule to a third person who reasonably recognized the statement as being defamatory; (2) that the statement was false; (3) that the defendant was at fault in communicating the statement; and (4) that the plaintiff suffered harm. *Hearst Corporation v. Hughes*, 297 Md.

112, 466 A.2d 486 (1983); *Gooch v. Maryland Mechanical,* 81 Md.App. 376, 567 A.2d 954 (1990). The standard of fault applicable to the third element depends, to a large extent, on the circumstances under which the communication was made. Maryland has long recognized, for example, that "communications arising out of the employer-employee relationship clearly enjoy a qualified privilege." *McDermott v. Hughley,* 317 Md. 12, 28, 561 A.2d 1038 (1989). That includes statements accusing employees or former employees of theft. *General Motors Corp. v. Piskor,* 277 Md. 165, 352 A.2d 810 (1976); *Jacron Sales Co. v. Sindorf,* 276 Md. 580, 350 A.2d 688 (1976). To overcome that privilege, the plaintiff must show that the defendant either knew that the statement was false or that he acted with reckless disregard of whether it was true or false. Mere negligence is not enough. *Marchesi v. Franchino,* 283 Md. 131, 387 A.2d 1129 (1978).

■ Preliminarily, we note that no evidence appears that Rosenfeld made any kind of defamatory statement to Detective Brady before April 23, 1987. Indeed, it appears that, except for a brief telephone conversation on April 21, which was for the purpose of scheduling an appointment for the 23rd, Rosenfeld never even talked to Brady before then. Kairys's action for defamation, therefore, must rest on what Rosenfeld told Brady on the 23rd.

As we indicated, there is some discrepancy between the versions of that conversation given by Rosenfeld and Brady. Rosenfeld described it thusly:

"I told him we were missing a deposit. That a couple of the employees had taken polygraph tests involving this situation and that [Kairys] failed the polygraph. He had taken a couple of polygraph tests. He failed them.

His claim was that he put money in the safe. Richard Walls' claim was that he didn't put the money in the safe; that it was in an envelope alongside the counter. [Kairys] also said that somebody used the bathroom, Warfield. That Warfield used the bathroom, and that he felt that he

could have very easily went in and opened the safe and taken the money out, and what to do. That was my conversation with him."

When asked whether he indicated to Brady that he thought that Kairys had stolen the money, Rosenfeld replied "I'm not sure."

Detective Brady stated that Rosenfeld acknowledged that he had no personal knowledge of the matter and that he suspected Kairys based on the polygraph examination. Rosenfeld represented that Kairys was the only person who had access to the safe and that he had shown deception on the polygraph tests.

None of this evidence suffices to show that Rosenfeld had any actual knowledge that his suspicion or accusation of Kairys was false. Indeed, there was a good bit of information casting suspicion on Kairys. Although we have held, because of their unproven reliability and for public policy reasons, that the results of a polygraph examination obtained in violation of the Maryland statute cannot be used to establish probable cause to institute a criminal proceeding, we are not prepared to exclude them from the quantum of knowledge available to Rosenfeld in determining whether he acted with reckless disregard of the truth or falsity of his statements. That the law is not prepared to accept those results as probative does not mean that it was reckless for Rosenfeld subjectively to do so.

Accordingly, we find no sufficient evidence in the record to support a conclusion that Rosenfeld acted with knowing falsity or with reckless disregard of truth, and therefore find no error in the summary judgment entered as to Count II.

### Abuse of Process

■ Abuse of process occurs when "a party has wilfully misused criminal or civil process after it has issued in order to obtain a result not contemplated by law." *Krashes v. White,* 275 Md. 549, 555, 341 A.2d 798 (1975). As further

expounded in *Palmer Ford, Inc. v. Wood, supra,* 298 Md. 484, 511, 471 A.2d 297, quoting from W. Prosser, *Handbook of the Law of Torts* 857:

> "The essential elements of the abuse of process, as the tort has developed, have been stated to be: first, an ulterior purpose, and second, a wilful act in the use of the process not proper in the regular conduct of the proceeding. Some definite act or threat not authorized by the process, or aimed at an objective not legitimate in the use of the process is required; and there is no liability where the defendant has done nothing more than carry out the process to its authorized conclusion, even though with bad intentions."

The thrust of Kairys's complaint here is that Douglas abused the criminal process issued against him "in an attempt to force [Kairys] to execute a general release, releasing [Douglas] from all civil liability resulting from [the criminal charge]." This, apparently, has reference to Rosenfeld's offer at the August pre-trial proceeding to have the charges dismissed in return for a release by Kairys, an offer that Kairys refused. That is not sufficient. There is nothing to show that the criminal charge was made for any ulterior purpose, for any purpose other than to bring Kairys to justice for the theft of the money. Once issued, it was not used in an effort to collect a debt, to have Kairys do anything he was not otherwise obliged to do, or to injure him in any inappropriate way. The process was used throughout in precisely the way the law envisions. That at some point Mr. Rosenfeld felt that it might be in everyone's best interest if the criminal case was terminated and a release given in no way means that the criminal process was abused. There is nothing in this record to indicate that Mr. Rosenfeld was any less convinced of Kairys's guilt in August than he was in April or that the proceeding was maintained for any reason other than to bring Kairys to justice. Summary judgment was appropriate as to Count III.

## Conspiracy

Kairys alleged in Count V that Douglas, Rosenfeld, and Moore "conspired to administer the polygraph" to Kairys knowing that it was illegal to require such an examination as a condition of Kairys's continued employment. It appears that this claim is based on two different circumstances: requiring Kairys to undergo the two examinations that were actually administered and "the requested taking of another polygraph examination which was refused by [Kairys]." Nothing more is said in the complaint about this third examination. In deposition testimony, however, Kairys said:

> "The day that I was arrested I sat down at the jail a few hours. When I was released I went directly to Beltsville to see [Rosenfeld] and Douglas because I was stunned. Naturally I had no idea that somebody was going to go that far, you know, for whatever it is they had to prove. And it was maintained that if I wanted to continue working there that, you know, I had to take another polygraph. It was take another polygraph. Take it at the police department."

Kairys said that he refused to take another test and that he was discharged.

There are two critical flaws in Kairys's action. First, although there was sufficient evidence to show that Rosenfeld may have violated the statute regarding polygraph examinations, there is absolutely nothing to show that Mr. Moore violated the statute or was part of any conspiracy to do so. On the two occasions that he administered the examination, he obtained a written consent in which Kairys attested that his appearance was entirely voluntary and that his employment was not dependent on his taking the test. There is nothing to show that Mr. Moore had any contrary knowledge. With respect to the third examination, which Kairys refused, there is nothing to show that Moore was in any way involved; that test, according to Kairys, was to be conducted by the police

department. Clearly, then, there was nothing to show a conspiracy on Moore's part.

■ That leaves only Rosenfeld and Douglas. But the complaint alleges that "at all times mentioned herein," Rosenfeld was acting as agent for Douglas within the scope of his duties. No conspiracy can lie between a corporation and its agent acting within the scope of his duties. In *Marmott v. Maryland Lumber Co.*, 807 F.2d 1180, 1184 (4th Cir.1986), *cert. denied* 482 U.S. 929, 107 S.Ct. 3214, 96 L.Ed.2d 700 (1987), the Court put it succinctly: "The law is well-settled ... that a conspiracy between a corporation and its agents, acting within the scope of their employment, is a legal impossibility." *See also Layton v. AAMCO Transmissions, Inc.*, 717 F.Supp. 368, 370 (D.Md.1989); *Thompson Coal Co. v. Pike Coal Co.*, 488 Pa. 198, 412 A.2d 466 (1979). The reason for this is that "[a] corporation acts through its agents and the acts of the agent are the acts of the corporation." *Soft Water Utilities, Inc. v. LeFevre*, 159 Ind.App. 529, 308 N.E.2d 395, 399 (1974). There is no conspiracy in this circumstance because there is no combination.

### False Imprisonment

■ The false imprisonment action pled in Count VI is founded on the allegations that Rosenfeld, as agent for Douglas, "did provide false information" to the county police that Kairys "had committed a theft," that as a result of that false information Kairys was arrested and wrongfully detained, that the arrest was made without probable cause and therefore constituted a false imprisonment, and that Rosenfeld "had no knowledge" that Kairys had committed a theft.

We discussed the elements of this tort recently in *K–Mart Corp. v. Salmon*, 76 Md.App. 568, 547 A.2d 1069 (1988). At 583–85, 547 A.2d 1069, we said, in pertinent part:

"In a false imprisonment action, a plaintiff must prove that he or she was deprived of his or her liberty by

another without his or her consent and without legal justification.... Legal justification is the equivalent of legal authority: that is, in the usual case an action for false imprisonment will not lie where the arrest is effected pursuant to a valid arrest warrant.

. . . . .

Although a private person does not become liable for false imprisonment for merely giving mistaken information to authorities, the opposite is true where a person *knowingly* gives false information to an arresting officer."

Essentially for the reasons stated with respect to the defamation action, we find no evidence here that Rosenfeld made a knowingly false statement to Detective Brady. Accordingly, summary judgment was properly entered on Count VI.

JUDGMENTS AFFIRMED AS TO COUNTS II, III, V, AND VI; JUDGMENT REVERSED AS TO COUNT I; CASE REMANDED TO CIRCUIT COURT FOR PRINCE GEORGE'S COUNTY FOR FURTHER PROCEEDINGS ON COUNT I; COSTS TO BE PAID ONE–HALF BY APPELLANT, ONE–HALF BY APPELLEE DOUGLAS.